**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

In re

PVP KREWSTOWN, LLC

Debtor.
_____________________________________/

Chapter 11

Case No. 23-16198-MAM

Plaintiffs,

v.

Adversary No.

ICA Acquisition Krewstown, LLC,
ICA Acquisition Castor, LLC,
ICA Acquisition Troy, LLC,
ICA Acquisition Battle Creek, LLC,
ICA Acquisition Hines, LLC,
ICA Acquisition Baltimore, LLC,
FI 135 Krewstown Philadelphia, LLC,
FI 135 Castor Philadelphia, LLC,
FI 135 Troy, LLC,
FI 135 Battle Creek, LLC,
FI 135 Hines, LLC,
FI 135 Baltimore LLC, and
Bloomfield Capital Asset Management, LLC,

Defendants.
________________________________/

**ADVERSARY COMPLAINT TO AVOID AND RECOVER**
**FRAUDULENT TRANSFERS, AND OTHER RELATED RELIEF**

Plaintiff, PVP Krewstown, LLC, (formerly 98 RA2 Philadelphia-Krewstown Limited Partnership,) ("**Debtor**")[1] files this Adversary Complaint to Avoid and Recover Fraudulent Transfers, and for Other Related Relief, ("**Complaint**") against ICA Acquisition Battle Creek, LLC, ICA Acquisition Castor, LLC, ICA Acquisition Hines, LLC, ICA Acquisition Krewstown,

---

[1] This definition of Debtor includes and shall be construed to PVP Krewstown, LLC and its predecessor entities where applicable throughout the allegations below.

LLC, ICA Acquisition Troy, LLC, FI 135 Krewstown Philadelphia LLC, FI 135 Castor Philadelphia, LLC, FI 153 Troy, LLC, FI 135 Battle Creek, LLC, FI 135 Hines, LLC, and FI 135 Baltimore, LLC, and Bloomfield Capital Asset Management, LLC (collectively "**Defendants**"), and alleges the following:

## PARTIES

1. Debtor is the Plaintiff and the Chapter 11 Debtor in possession.

2. Debtor is a Delaware limited liability company with its principal place of business in Jupiter, Florida.

3. Allerand UBSP Holdingco, LLC ("**Allerand**") is the sole member of the Debtor and is controlled by Richard J. Sabella ("**Sabella**").

4. Defendant, ICA Acquisition Krewstown Philadelphia, LLC ("**ICA Krewstown**") is a Michigan limited liability company that alleges to hold the rights to the ICAs (defined below) assigned to it by Financial Structures Limited ("**FSL**"). ICA Krewstown was expressly created to further the scheme described herein.

5. Defendant, ICA Acquisition Castor Philadelphia, LLC ("**ICA Castor**") is a Michigan limited liability company that alleges to hold the rights to the ICAs assigned to it by FSL. ICA Castor was expressly created to further the scheme described herein.

6. Defendant, ICA Acquisition Battle Creek, LLC ("**ICA Battle Creek**") is a Michigan limited liability company that alleges to hold the rights to the ICAs assigned to it by FSL. ICA Battle Creek was expressly created to further the scheme described herein.

7. Defendant, ICA Acquisition Troy, LLC ("**ICA Troy**") is a Michigan limited liability company that alleges to hold the rights to the ICAs assigned to it by FSL. ICA Troy was expressly created to further the scheme described herein.

8. Defendant, ICA Acquisition Hines, LLC ("**ICA Hines**") is a Michigan limited liability company that alleges to hold the rights to the ICAs assigned to it by FSL. ICA Hines was expressly created to further the scheme described herein.

9. Defendant, ICA Acquisition Baltimore, LLC ("**ICA Baltimore**"), is a Michigan limited liability company that alleges to hold the rights to the ICAs assigned to it by FSL. ICA Baltimore was expressly created to further the scheme described herein. ICA Baltimore, ICA Hines, ICA Troy, ICA Battle Creek, ICA Castor, and ICA Krewstown are collectively known as the "**ICA Acquirers**."

10. Defendant, FI 135 Krewstown Philadelphia, LLC ("**FI 135 Krewstown**") is a Michigan limited liability company and purports to hold a Loan (defined below) owed by the Debtor. FI 135 Krewstown was expressly created to further the scheme described herein.

11. Defendant, FI 135 Castor Philadelphia, LLC ("**FI 135 Castor**") is a Michigan limited liability company and purports to hold a Loan owed by the Debtor. FI 135 Castor was expressly created to further the scheme described herein.

12. Defendant, FI 135 Troy, LLC ("**FI 135 Troy**") is a Michigan limited liability company and purports to hold a Loan owed by the Debtor. FI 135 Troy was expressly created to further the scheme described herein.

13. Defendant, FI 135 Battle Creek, LLC ("**FI 135 Battle Creek**") is a Michigan limited liability company and purports to hold a Loan owed by the Debtor. FI 135 Battle Creek was expressly created to further the scheme described herein.

14. Defendant, FI 135 Hines, LLC ("**FI 135 Hines**") is a Michigan limited liability company and purports to hold a Loan owed by the Debtor. FI 135 Hines was expressly created to further the scheme described herein.

15. Defendant, FI 135 Baltimore, LLC ("**FI 135 Baltimore**") is a Michigan limited liability company and purports to hold a Loan owed by the Debtor. FI 135 Baltimore was expressly created to further the scheme described herein (FI 135 Krewstown, FI 135 Castor, FI 135 Battle Creek, FI 134 Troy, FI 135 Hines, and FI 135 Baltimore, are collectively referred to herein as the "**Purported Lenders**").

16. Upon information and belief, the Purported Lenders and the ICA Acquirers are all owned and controlled by Defendant, Bloomfield Capital Asset Management, LLC ("**Bloomfield**"), a Michigan limited liability company with a primary place of business in Birmingham, Michigan.

17. Upon information and belief, related party but not a defendant, MCB Real Estate LLC ("**MCB**"), a Maryland limited liability company with a primary place of business in Baltimore, Maryland, at certain relevant times as set for below, acted as an agent for the ICA Acquirers and Bloomfield to help them avoid optics and legal ramification that Bloomfield owns and/or controls all of the ICA Acquirers and Purported Lenders.

**<u>JURISDICTION AND VENUE</u>**

18. This adversary proceeding is brought by the Debtor pursuant, *inter alia,* to 11 U.S.C. §§ 548, 510, and 550; and Fed. R. Bank. P. 7001, et. seq. to avoid and recover certain fraudulent transfers of property and other related relief.

19. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157, 1107, 1334 and Administrative Order 2012-25 of the United States District Court, Southern District of Florida.

20. This adversary proceeding is a core proceeding for which the Court is authorized to hear and determine all matters regarding this case in accordance with 28 U.S.C. §§ 157(b)(2) (B), (H), and (O).

21. Venue is proper in this district pursuant to 28 U.S.C. § 1409, as this adversary proceeding arises under Title 11 of the United States Code ("**Bankruptcy Code**") and relates to a case under the Bankruptcy Code, which is pending in this district.

## GENERAL ALLEGATIONS

22. In July and August 1998, the Debtor and five of its related entities were formed to purchase, own and lease to Rite Aid Corporation or one of its affiliates (either Rite Aid Corporation or any such affiliate, "**RAD**") six parcels of realty improved as retail drug stores.

23. The six parcels, all of which were purchased on August 28, 1998, were the following: 4604 Harford Road, Baltimore, Maryland 21214 ("**Baltimore Property**"), 629 North Highway 20, Hines, Oregon 97720 ("**Hines Property**"); 7972 Castor Avenue, Philadelphia, Pennsylvania 19152 ("**Castor Property**"), 9280 Krewstown Road, Philadelphia, Pennsylvania 19115 ("**Krewstown Property**"), 2971 Maple Road, Troy, Michigan 48084 ("**Troy Property**") 1434 W. Michigan Avenue, Battle Creek, Michigan 49037 ("**Battle Creek Property**") (collectively the "**Properties**").

24. The Properties were part of a portfolio with approximately 20 other similar entities and properties referred to as the "**UBS Portfolio**."

25. A property located at 101 Rosser Ave., Waynesboro, Virgina, 22980 ("**Waynesboro Property**"), also was a part of the UBS Portfolio, but is not currently owned by the Debtor as a result of Defendants' unscrupulous acts, as discussed below in greater detail.

26. The purchase of each of the Properties was financed through a loan funded by PW Real Estate Investments, Inc. (each a "**Loan**").

27. At some time prior to the September 1, 2020 maturity of the Loans (the "**Maturity Date**"), each Loan was either assigned to or otherwise came to be owned or controlled by U.S.

Bank National Association ("**U.S. Bank**") as trustee.

28. Each Loan was evidenced by a secured note and a loan agreement (each, a "**Loan Agreement**") dated as of August 24, 1998 (the **"Origination Date"**) and was secured by certain mortgage, assignment and other security documents (all the applicable documents so evidencing or securing each Loan, the "**Loan Documents**" in respect of such Loan).

29. The Loan Documents in respect of the Baltimore Property evidenced and secured a Loan borrowed by RA2 Baltimore-Harford L.L.C. (later merged into AUBSP Ownerco 10, LLC) having an original principal amount of $2,597,956.67.

30. The Loan Documents in respect of the Hines Property evidenced and secured a Loan borrowed by RA2 Hines L.L.C. (later merged into AUBSP Ownerco 11, LLC) having an original principal amount of $2,379,222.11.

31. The Loan Documents in respect of the Troy Property evidenced and secured a Loan borrowed by RA2 Troy L.L.C. (later merged into AUBSP Ownerco 12, LLC) having an original principal amount of $4,298,868.26.

32. The Loan Documents in respect of the Battle Creek Property evidenced and secured a Loan borrowed by RA2 Battle Creek L.L.C. (later merged into AUBSP Ownerco 13, LLC) having an original principal amount of $3,108,703.28.

33. The Loan Documents in respect of the Castor Property evidenced and secured a Loan borrowed by 98 RA2 Philadelphia Castor, Limited Partnership (later converted to PVP Castor, LLC) having an original principal amount of $2,276,266.46.

34. The Loan Documents in respect of the Krewstown Property evidenced and secured a Loan borrowed by 98 RA2 Krewstown Limited Partnership (later converted to the Debtor) having an original principal amount of $2,692,406.67.

35. Each of PVP Castor, LLC, AUBSP Ownerco 10, LLC, AUBSP Ownerco 11, LLC, AUBSP Ownerco 12, LLC and AUBSP Ownerco 13, LLC was merged into and with the Debtor in November 2022. The Debtor is the surviving entity of such mergers.

36. Contemporaneously with the funding of the Loans, the Debtor entered into triple net lease agreements for each of the respective Properties ("**Lease Agreements**") with RAD.

37. As a condition of funding each Loan, the lender of each Loan (together with each successor holder of such Loan, the "**Lender**" of such Loan) required the Debtor to purchase residual value insurance ("**RVI Policies**") from FSL, which insured payment of the balloon amount of each Loan if the balloon was not paid on the Maturity Date. See attached RVI Policy for the Hines Property as **Exhibit A**, which is similar in nature to all of the applicable RVIs.[2]

38. The Lender and FSL also required that the Debtor execute agreements that provided for the immediate forfeiture of each Property to FSL "for no additional consideration" if, for any reason whatsoever, the applicable Loan was not paid in full on the Maturity Date, time being of the essence with respect to such payment obligation. These agreements were called "insured covenants agreements" ("**ICAs**"). See attached ICA for the Battle Creek Property, which is similar in nature to all of the ICAs, as **Exhibit B**.[3]

39. In addition to the RVI Policies, another separate agreement was executed only between FSL and the Lender in respect of each Loan entitled an "Additional Named Insured Endorsement."

40. The claim amount which FSL was bound to pay in the event a valid demand was made by the Lender under any RVI Policy (the "**Insured Value**") was defined in the RVI Policies

---

[2] The Debtor is not attaching similar RVI Policies for each of the Properties are they are largely similar in nature other than, for example, the legal description.
[3] See FN 1.

as all amounts due and payable on the Loans the Maturity Date, which were the outstanding amounts owed by the Debtor on the Maturity Date as follows:

(a) $956,525 in respect of the Loan relating to the Baltimore Property

(b) $666,793 in respect of the Loan relating to the Hines Property,

(c) $1,785,457 in respect of the Loan relating to the Troy Property,

(d) $941,741 in respect of the Loan relating to the Battle Creek Property,

(e) $911,625 in respect of the Loan relating to the Castor Property, and

(f) $986,040 in respect of the Loan relating to the Krewstown Property.

41. Each Loan Agreement required that the proceeds of the related RVI Policy, *i.e.* the monies paid as Insured Value by FSL, should be applied to retire the applicable Loan.

42. Nevertheless, the RVI Policies had language which allowed for an assignment of the unsatisfied Loans if certain conditions were properly exercised by FSL.

43. Before the Maturity Date, Allerand actively tried to acquire several of the Debtor's Loans on behalf of the Debtor. It also retired loans similar to the Loans on many other properties similar to the Properties, but unrelated to the Debtor.

44. These efforts were complicated by the COVID-19 pandemic. At the very time of maturity of the UBS Portfolio and for months thereafter, all or nearly all institutional lenders for assets like the Properties suspended loan origination business operations because of the uncertainty in financial markets deriving from the pandemic.

45. The financing situation improved during the 3rd and 4th quarters of 2020.

46. During the 4th quarter of 2020, Allerand actively negotiated refinancing of similar loans to the Loans with FSL, and it reached preliminary terms for forbearance and acquisition of certain of the Debtor's Loans with FSL to benefit the Debtor. At and through this time, the Debtor

owned all of the Properties.

47. Before the Maturity Date, Allerand, acting for the benefit of the Debtor, also negotiated prospective lease renewals for some of the Properties with RAD.

48. The Loans matured on September 1, 2020.

49. On or about September 9, 2020, U.S. Bank, the then-current Lender, sent a Notice of Default to the Debtor.

50. On or about September 14, 2020, FSL paid what it claimed to be the Insured Values to U.S. Bank.

51. On September 14, 2020, U.S. Bank assigned all the Loan Documents to the following affiliates of FSL: Krewstown Philadelphia RA-357 LLC, Castor Philadelphia RA-357 LLC, Troy RA-357, LLC, Battle Creek RA-357, LLC, Hines RA 357, LLC, and Baltimore RA 357 LLC (the "**FSL Subsidiaries**").

52. U.S. Bank, FSL and Defendants have claimed the Loans are still unpaid and enforceable through foreclosure.

53. On or about March 11, 2021, the Debtor began the process of attempting to repay Loans.

54. By the end of March of 2021, Allerand had sourced and closed 27 short- and long-term loans for other properties similar to the Properties. Not one of those lenders or any other deal participant questioned Allerand's "authority" to act for the applicable borrowers.

55. In fact, Allerand had letters of intent to refinance a number of other similar loans acquired by FSL from at least two other lenders, and it paid substantial deposits to one lender on behalf of the Debtor with the intention of closing the refinancing of the Loans of the Properties.

56. Like various other deals, post-Maturity Date, FSL engaged in negotiations

regarding the Debtor's payoff of the Loans with and through Allerand.

57. Unbeknownst to the Debtor, the Defendants were working in concert to thwart the Debtor's ability to pay off the Loans so the Defendants could usurp millions of the Debtor's equity in the Properties over and above any possible, legitimate loan amount.

58. Upon information and belief, the Defendants learned confidential information related to the Debtor, obtained through their relationship with a broker that introduced FSL and the Defendants to the RAD transactions relating to the Properties, which broker had obtained the confidential information from insiders at RAD in violation of his own fiduciary duties to RAD.

59. The confidential information included, but was not limited to, the following:

a) the structure of the Debtor's equity ownership and its negotiations to refinance the Loans;

b) confidential lease, profit, and demographic data on properties leased by RAD;

c) tenant estoppel certificates;

d) Debtor's and its affiliates' ongoing negotiations with FSL; and

e) RAD's intention to renew its lease for the Properties,

(collectively "**Secret RAD Information**").

60. When Bloomfield (and therefore the ICA Acquirers and Purported Lenders) acquired the Secret RAD Information, the principal amount of each of the Debtor's Loans had been paid down by approximately $2 million per Loan, giving rise to substantial equity in the Properties.

61. Based on the Secret RAD Information, Defendants became aware the Properties held substantial value (at least $12 million) above the Loans.

62. As a result of acquiring the Secret RAD Information, Defendants were under the mistaken belief that the Debtor would not be able or willing to pay off the Loans.

63. Defendants therefore hatched a scheme to use the Secret RAD Information to usurp the Debtor's equity in the Properties by gaining control of the Loan Documents and ICAs from FSL, representing that the Loans continued to evidence a valid debt while simultaneously preventing payoff of the Loans (whereas any legitimate creditor would want to be paid), and subordinating the Loans to the ICAs to chill the bidding at any foreclosure sale and make impossible any potential refinancing or payoff of the Loans or any redemption of the equity in the Properties that accrued over nearly a quarter century.

64. On or about April 27, 2021, AUBSP Ownerco 10, LLC, AUBSP Ownerco 11, LLC, AUBSP Ownerco 12, LLC, AUBSP Ownerco 13, LLC, AUBSP Ownerco 16, LLC, and AUBSP Ownerco 17, LLC (the "**AUBSP Companies**") were each formed as single member limited liability companies to engage in merger transactions to simplify the Debtor's ownership of the Properties to facilitate the refinancing of the Loans.

65. Also around this time, the Debtor continued to negotiate a refinance of the Loans with FSL and/or the FSL Subsidiaries which held the Loans. FSL and/or FSL Subsidiaries even negotiated a detailed forbearance and loan acquisition arrangement relating to the Loans. See attached **Exhibit C** (the "**Forbearance Agreement**").

66. After months of negotiation and an agreement in principle, FSL suddenly declined to sign the Forbearance Agreement relating to the Properties, alleging that documentation was somehow now unnecessary based on the history between the parties and the successful resolution of the other properties in the UBS Portfolio.

67. Through discovery, however, the Debtor discovered the real reason FSL no longer

wanted or needed to document the Forbearance Agreement. On or about June 17, 2021, the FSL Subsidiaries transferred their interests in the Loans to the Purported Lenders, mostly for par (other than the Loans related to the Waynesboro and Baltimore Properties, which Loans were sold for less because these Properties were not fully occupied).

68. Also on June 17, 2021, by no coincidence and for no consideration, FSL transferred its interests in the ICAs to the ICA Acquirers.

69. The FSL Subsidiaries, who held the ICA rights for over 7 months, never attempted to enforce the ICA rights as they could have, nor has any other person or entity done so other than Bloomfield and its broker and affiliate in respect of the properties associated with AUBSP Ownerco 8, LLC and AUBSP Ownerco 9, LLC (see 22-18613-MAM).

70. The transactions evidenced by these events above can be summarized by the following: Bloomfield purchased the Loans from FSL's Subsidiary, most of them for the exact amount of the Loan balances, and it acquired the ICAs from FSL for no consideration, not even one dollar (despite the existence of over $12 million in equity in the Properties at the time of acquisition).

71. Neither FSL nor the FSL Subsidiaries made any representation whatsoever concerning the validity or enforceability of the documents assigned by them. Neither FSL, the FSL Subsidiaries, nor any Defendant sought an estoppel or other affirmation from Debtor as to the validity or enforceability of any of documents or of the Debtor's authority to act.

72. Following Bloomfield's acquisition of the Loans and ICAs through the Purported Lenders and ICA Acquirers, respectively, the Debtor requested Loan payoff information from the Purported Lenders.

73. On or about July 28, 2021, the Purported Lenders each sent a notice of default and

demand letter to the Debtor, seeking payment for amounts owed under the Loan Documents on or before August 4, 2021 ("**Notice of Default**"), attached hereto as **Composite Exhibit D**.[4]

74. The Notices of Default demanded, in part, that all rents owed by RAD at each of the Properties be paid to the Purported Lenders, and noted "failure to do so or any attempts by Borrower to keep, acquire or direct to be paid any Rents or Cash Collateral will result in liability to all persons involved in such diversion …to the full extent provided in the loan Document and under applicable law." See Exhibit D.

75. Despite the Notices of Default, the Purported Lenders refused to provide the Debtor with accurate payoff amounts in light of the Debtor's stated indication to pay off the indebtedness for the Loans. For example, the Notices of Default provided payoff amounts only through August 1, 2021, but the Debtor was attempting to pay on the demand date of August 4, 2021, and therefore needed updated payment amounts for three additional days.

76. The Debtor's representative contacted Bloomfield on August 3, 3021, and requested updated payoff numbers and payment instructions pursuant to the Notices of Default.

77. The Debtor did not receive payment or wire instructions at this time, despite working to pay off the Loans and depositing, for example, the full amount of funds in escrow with First American Title Insurance Company necessary to pay the indebtedness related to the Battle Creek Property before August 4, 2021.

78. Instead of readily providing accurate payoff numbers, as any normal lender would do, the Purported Lenders instead questioned Allerand's "authority" to act for the Debtor to pay off the Loans. On August 3, 2021, counsel for the Purported Lenders disingenuously requested such 'authority' information under Section 15.07 of the Loan Agreement respecting each of the

---

[4] Debtor is including all Notices of Default, ICA Demands, Subordination Agreements, and Payoff Letters in its possession.

Properties knowing that such section was inapplicable, as it only related to a "Secondary Market Transaction," which this transaction clearly was not. See attached Loan Agreement as **Exhibit E**.

79. Section 15.07 provides that a lender shall have the right to participate in a Secondary Market Transaction (including sale, participation, or creation of a depository trust) and the Debtor "shall provide such information and documents relating to the [Debtor], the [Properties], the Lease, and the Lessee, in each case as the Lender may reasonably request in connection with the Secondary Market Transaction, provided the [Debtor] has such information in its possession."

80. The Purported Lenders never indicated they were entering into a Secondary Market Transaction, nor offered to sell the Loans, when making this unreasonable demand.

81. Further, when they acquired the ICAs from FSL, neither Bloomfield nor the ICA Acquirers sought Allerand's 'authority' to act when they demanded, though Allerand, the Debtor turn over its Properties.

82. The Purported Lenders continued this ruse in their August 3, 2021 correspondence to the Debtor, stating "it is the Lender's *standard practice* for loans that are in default such as the subject Loan, for the Borrower to execute a copy of the payoff statement to affirm its contents. The Lender simply wants to know with whom it is dealing as there has been little communication from the Borrower." *Id*. (emphasis added).

83. However, the Purported Lenders have no 'standard practice,' history of lending, or any typical loan procedures of any kind, as each of them was specifically formed by Bloomfield to own the Loans for the *sole purpose* of acting in concert with the ICA Acquirers to usurp the Debtor's equity in the Properties and actively prevent repayment of their purported Loans.

84. The ICA Acquirers and the Purported Lenders were all formed as limited liability

companies on the same date—June 10, 2021, only a week prior to acquiring the ICAs and Loans, respectively, from FSL and the FSL Subsidiaries.

85. The Purported Lenders could not possibly have had any good faith doubt about the Debtor's "authority" to act because the Purported Lenders were already in possession of relevant information, and they allegedly stepped into the shoes of FSL who was previously negotiating payoffs of the Debtor's debt and for other identical deals.

86. During the communications regarding the Debtor's request to pay the Loans, the Purported Lenders were advised that Richard Sabella and Peter Paganelli had authority to act for the Debtor, which information the Purported Lenders ignored.

87. On or about August 4, 2021 in a call with the Purported Lenders' counsel, after the Debtor had repeatedly requested payoff amounts and instructions, it became clear that what Bloomfield *really* wanted was the deeds to the Properties (not payment of the Loans).

88. Consistent with the foregoing, on August 6, 2021, (for the Troy Property and the Battle Creek Property), and August 9, 2021 (for Krewstown, Castor, Hines and Baltimore Properties), while the Purported Lenders were advancing foreclosure demands, the ICA Acquirers sent Notices of Default and Demand for Deed ("**ICA Demand**") under the ICAs, indicating that the Debtor had "the immediate obligation to transfer [each] Property to the undersigned as assignee under the [ICA] Agreement…" (collectively as to each Property, the "**Transfers**," which definition incorporates, to the extent necessary, the Hines and Battle Creek Judgments, as further discussed below). See attached **Composite Exhibit F.**

89. The ICA Demands were sent to the Debtor by MCB on behalf of each ICA Acquirer as an "agent," although, upon information and belief, the ICA Acquirers are also owned by Bloomfield, as evidenced by public records demonstrating they share the same address. See

attached **Composite Exhibit G** (showing the address of ICA Acquisition Waynesboro, LLC is 700 Forest, Birmingham, MI 48009-6444, the same address as Bloomfield Capital Asset Management).

90. The ICA Acquirers, who paid nothing for the ICAs, demanded in the ICA Demands that the Debtor execute documents to transfer the deeds to each Property to the ICA Acquirers as set forth in documents attached to the ICA Demand (the "**Transfer Documents**").

91. As late as August 9, 2021, the Purported Lenders still had not provided accurate payoff amounts or wire instructions and continued to ask the Debtor for information about Sabella's or Allerand's ability to act for the Debtor (even though the Purported Lenders sent the Notices of Default and many other correspondence to Allerand relating to the Loans).

92. On August 11, 2021, the Purported Lenders finally sent updated payoff letters related to the Troy and Battle Creek Properties (to and through Allerand).

93. The payoff letters were not sent alone such that the related Loans could simply be paid (and the Battle Creek escrowed funds released). The Purported Lenders sent payoff letters with Subordination Agreements in favor of the ICA Acquirers (executed on or about August 4, 2021).

94. These Subordination Agreements subordinate the Purported Lenders' rights to the ICA Acquirers' rights, and provide:

> (a) The lien of the Mortgage (including any amendment, renewal and extension thereof), and all rights of the FI 135 or any successor lender (in each case, "**Lender**") are now, and shall at all times continue to be, subject and subordinate in all respects to the ICA Rights and claim, and any right to a lien, of the holder thereof (any such holder being the "**ICA Rights Holder**"), including all the terms, conditions and provisions of the ICA Rights.
>
> (b) The Lender agrees that the ICA Rights Holder, as the holder of an interest superior in right to the holder of the lien of the Mortgage, shall not be named or joined as a party defendant in any action, suit or proceeding which may be instituted by the Lender to foreclose the Mortgage or to collect the debt

secured thereby, or which may otherwise be instituted or taken under or in connection with the Loan Agreement (as defined in the Mortgage) or any obligations secured thereby by reason of a default under the Loan Agreement or an event of default under the Loan Agreement, unless the ICA Rights Holder or any Person claiming through or under the ICA Rights Holder is deemed a necessary party to such action, suit or proceeding, in which event such party may be so named or joined but such naming or joinder shall not otherwise be in derogation of the ICA Rights, and the ICA Rights shall continue in full force and effect and shall continue in full force and effect notwithstanding the commencement and/or completion of any such proceeding.

(c) If, at any time, the Lender, or any person, or the Lender's or such person's successors or assigns, or any purchaser at foreclosure (the Lender, or any such person being hereinafter referred to as the "**Successor Obligor"**), shall succeed to the interests of RA2 in the Property, then (a) the ICA Rights shall not terminate, (b) the Successor Obligor shall take title to the Property subject to the ICA Rights Holder's ICA Rights under the ICA, and (c) the Successor Obligor shall be deemed to have accepted and recognized the ICA Rights Holder as the owner of the ICA Rights upon the terms and conditions of the ICA and such ICA Rights shall continue in full force and effect as, or as if they were, direct contractual and/or legal rights between such Successor Obligor and the ICA Rights Holder. The foregoing provisions of this Section 3 shall inure to the benefit of and bind FI 135 and any successor Lender and shall apply notwithstanding that, as a matter of law, the ICA Rights may or would otherwise terminate upon the foreclosure (including judgment of foreclosure and sale) of the Mortgage.

See attached **Composite Exhibit H.**

95. The Subordination Agreements intentionally chilled and thwarted any possible payoff, refinancing, or sale of the Properties, and as set forth below, they effectively usurped the Debtor's Rights of Redemption (defined below) and benefits therefrom, and transferred the value of those beneficial interests to the ICA Acquirers.

96. When the Purported Lenders and ICA Acquirers filed their proofs of claim on October 13, 2023, neither filed, disclosed, or even referenced the Subordination Agreements.

97. On August 17, 2021, Purported Lenders sent similar payoff letters to the Debtor for the Castor, Krewstown, Hines, and Baltimore Properties, also attaching nearly identical

Subordination Agreements with the ICA Acquirers.

98. Acting in concert with the ICA Acquirers and Bloomfield, the Purported Lenders' August 11th and 17th, 2021 payoff letters ("**Payoff Letters**") advised, in pertinent part, notwithstanding any payment they received under any Loan, "all rights of [the ICA Acquirers], the holder[s] of the rights under the above-referenced ICA, shall remain enforceable and in full force and effect." See attached **Composite Exhibit I.**

99. Clearly, the ICA Acquirers and Purported Lenders together conspired to acquire the Loans for nearly face value, and the ICAs for free, to prevent Loan payoffs so they could obtain the Properties for far less than their fair value.

100. As yet more evidence of this scheme, the Payoff Letters also note:

> "[t]he totality of the agreements evidencing the financing arrangement so applicable to the Borrower's purchase of the Real Estate…appear to indicate the intent of the Borrower, Lender and Insurer that, upon Borrower's election not to pay off the Loan at maturity, the Real Estate could be promptly transferred to [FSL] in accordance with the ICA—with no further payment being made by the lender under the fully nonrecourse Loan documents, or to Borrower in consideration of the Real Estate."
>
> …
>
> [A]ny payoff of the Loan after the Borrower becomes unconditionally obligated to transfer the Real Estate under the ICA (as is now the case) may be viewed as an attempt to characterize the ICA Acquisition and Lender as seeking to realize a double recovery of sorts. Neither the Lender nor ICA Acquisition intend such double recovery; **accordingly, all amounts received in any payoff of the Loans will be refunded to Borrower upon the acquisition of the Real Estate by ICA Acquisition pursuant to the terms of the ICA**.

*Id.* (emphasis added).

101. Therefore, even if the Debtor paid the Loans, the Purported Lenders alleged they would return these payments when the ICA Acquirers, who paid nothing for the ICAs, received the Properties.

102. The ICA Acquirers and Purported Lenders clearly understood that together they (through Bloomfield) actively prevented payoff of the Loans and were seeking to usurp the Debtor's equity in the Properties.

103. The ICA Acquirers and Purported Lenders were aware, or should have been aware, that the Subordination Agreements eviscerated any Rights of Redemption the Debtor would have under state laws to pay the indebtedness under the Loans up to until, and in certain circumstances after, any foreclosure. They also would have eliminated any overbid proceeds that otherwise would have existed in a fair foreclosure. In fact, in another case using the same devious structure, the only bidder that showed up was an affiliate of Allerand, and, true to the same threat made by Bloomfield, the ICA holder in that case sued the foreclosure purchaser for specific performance of the ICA.

104. The Debtor's Rights of Redemption are valuable rights attendant to real estate, and belonged to the Debtor in states where the Debtor owns property.

105. In the fall of 2021, the Purported Lenders and ICA Acquirers commenced various actions in courts across the country to acquire the Properties.

106. As of September 2021, no less than ten (10) entities similarly situated with the Debtor from the original UBS Portfolio successfully used mergers to simplify their equity ownership to facilitate the refinancings of loans acquired by FSL at the Maturity Date.

107. Following this period, FSL maintained three of these original non-Debtor loans from the UBS Portfolio for itself, and FSL never attempted to demand turnover of the underlying collateral properties under the ICA for no additional consideration.

***Facts Specific to the Battle Creek Property***

108. On or about September 23, 2022, ICA Battle Creek filed a cause of action against

AUBSP Ownerco 13, LLC (now the Debtor) in the Circuit Court for Calhoun County, Michigan (the "**Calhoun Court**") initiating Case No. 22-2605, asserting claims for, among other things, specific performance of the ICA to the Battle Creek Property.

109. In this action, ICA Battle Creek filed a motion for summary disposition seeking specific performance and turnover of the Battle Creek Property, which the Debtor opposed.

110. On July 7, 2023, the Calhoun Court entered an order granting specific performance, quieting title to the Battle Creek Property in favor of ICA Acquisition Battle Creek, LLC ***as of August 6, 2021*** (the date of the ICA Demand) (the "**Battle Creek Judgment**"). See attached **Exhibit J.**

111. The other ICA Acquirers have sought similar relief in their respective jurisdictions following their respective ICA Demands made upon the Debtor.

112. ICA Battle Creek thereafter sent the Debtor another demand letter attaching Transition Documents and seeking the Debtor's execution of the Transfer Documents.

***Facts Specific to the Hines Property***

113. On January 27, 2022, FI 135 Hines initiated a foreclosure cause of action (the "**Hines Purported Lender Case**") against, RA2 Hines, L.L.C. (now the Debtor) in the Circuit Court in and for Henry County, Oregon (the "**Oregon Court**").

114. The Debtor accepted service on or about March 18, 2022, through counsel.

115. The Debtor filed a counterclaim, and the cause of action was set for trial in 2024.

116. Meanwhile, on or about November 3, 2022, ICA Hines filed another complaint for, among other things, specific performance in the same Oregon Court to order the Debtor to turn over the Hines Property for no other value (the "**ICA Specific Performance Case**").

117. ICA Hines issued a summons to the Debtor's prior registered agent in Oregon,

Corporation Service Company ("**CSC**"), instead of reaching out to the Debtor's known counsel in the Hines Purported Lender Case or serving the Delaware registered agent, as CSC ceased to be the registered Oregon agent for RA2 Hines, L.L.C. in 2001.

118. On information and belief, it was known to Bloomfield and ICA Hines that CSC was no longer a registered agent for the Debtor.

119. The same counsel representing FI 135 Hines in the Hines Purported Lender Case filed the ICA Specific Performance Case against the Debtor.

120. Notwithstanding this common relationship, counsel for FI 135 Hines and ICA Hines never notified counsel for the Debtor of the second case.

121. In fact, the same individual serving as counsel for FI 135 Hines and ICA Hines, both controlled by Bloomfield, attended a status conference in the Hines Purported Lender Case following the filing of the ICA Specific Performance Case, and he never updated the Oregon Court or the Debtor of the existence of the ICA Specific Performance Case, hoping instead to obtain a default judgment.

122. As such, the Debtor did not appear in the ICA Specific Performance Case, and ICA Hines obtained a judgment "as of August 6, 2021" against the Debtor on or about January 3, 2023 (the "**Hines Judgment**" (collectively with the Battle Creek Judgments, the "**Judgments**")). See attached **Exhibit K.**

123. Neither the motion for default nor the default judgment appear to have ever even been served on Debtor.

***Facts Specific to the Waynesboro Property***

124. As noted previously, the Waynesboro Property was part of the UBS Portfolio but is not currently owned by the Debtor.

125. On or about January 19, 2022, the Debtor lost the Waynesboro Property through an irregularly conducted, non-judicial foreclosure sale in favor of FI 135 Waynesboro, LLC.

126. The Debtor was unable to retain or redeem the Waynesboro Property due in part to the Subordination Agreement, which purported to remain an encumbrance on the Waynesboro Property following any third party's acquisition of such property in the foreclosure.

127. Accordingly, even if the Debtor or any other entity had acquired the Waynesboro Property at the foreclosure sale, ICA Waynesboro would have continued to demand specific performance of the Waynesboro Property.

128. In November 2022, AUBSP Ownerco 10, LLC, AUBSP Ownerco 11, LLC, AUBSP Ownerco 12, LLC, AUBSP Ownerco 13, LLC, AUBSP Ownerco 14, LLC, and AUBSP Ownerco 16, LLC, were merged into PVP Krewstown, LLC (the Debtor). The Debtor, PVP Krewstown, LLC, is the surviving company with rights to the Properties.

129. The ICA Acquires' and Purported Lenders' actions inequitably duplicate, or triplicate, their purported consideration. The ICA Acquirers are seeking to acquire rights in the Properties for the same initial consideration that the Purported Lenders are using to acquire rights to foreclose the Loans, resulting in a double recovery. Then both the ICA Acquirers and Purported Lenders executed Subordination Agreements to extract even more value under the one singular initial debt on the Loans they claim are still outstanding. To avoid this unfair and inequitable result, the Debtor filed a chapter 11 petition.

130. The status of the Debtor's Properties is as follows:

| **Baltimore Property** | **Hines Property** | **Troy Property** | **Battle Creek Property** | **Waynesboro Property** | **Castor Property** | **Krewstown Property** |
|---|---|---|---|---|---|---|
| Subject to ICA Demand by ICA Acquisition Baltimore, LLC and Foreclosure Demand by FI 135 Baltimore, LLC | Hines Judgment entered as of August 6, 2021 | Subject to ICA Demand by ICA Acquisition Troy, LLC and Foreclosure Demand by FI 135 Troy, LLC | Battle Creek Judgment entered as of August 6, 2021 | Lost to FI 135 Waynesboro, LLC in improper foreclosure, chilled by subordination agreement | Subject to ICA Demand by ICA Acquisition Baltimore, LLC and Foreclosure Demand by FI 135 Baltimore, LLC | Subject to ICA Demand by ICA Acquisition Baltimore, LLC and Foreclosure Demand by FI 135 Baltimore, LLC |

***The Debtor's Chapter 11 Petition***

131. The Debtor filed its voluntary Chapter 11 petition on August 4, 2023 (the "**Petition Date**").

**COUNT I**
**ACTION AGAINST ICA ACQUIRERS AND BLOOMFIELD**
**TO AVOID CONSTRUCTIVELY FRAUDULENT**
**TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(B)**
**(Specific performance demands)**

132. Paragraphs 1 through 131 are realleged and incorporated by reference.

133. This is an action to avoid a fraudulent transfer of property pursuant to 11 U.S.C. § 548(a)(1)(B).

134. The Transfers (effective on August 6, and August 9, 2021 as applicable to each Property, effectuated when the ICA Acquirers made demand for specific performance and turnover of the Properties, thereby transferring the equitable beneficial interests in the Properties) were made within two (2) years of the Petition Date.

135. Alternatively to the extent not effectuated upon the ICA Acquirers' election of remedy under the ICA Demand, all references to Transfers also incorporate the entry of the

Judgments or any similar judgments under the ICAs.

136. The Transfers were real and valuable rights that were effectuated upon the demand for specific performance to acquire real property.

137. Regarding the election of specific performance remedies under the ICA Demands, the ICA Acquirers and the Hines and Calhoun Courts have taken the position that equitable and beneficial interests in the Properties were transferred to the ICA Acquirers.

138. In fact, following the Transfers of equitable and beneficial interests in the Properties pursuant to the ICA Demands, the ICA Acquirers, together with common ownership of the ICA Acquirers and Purported Lenders, also controlled and directed the payment of rents associated with the Properties away from the Debtor.

139. Alternatively, to the extent the Court determines no Transfer was made, the ICA Acquirers' Claims should be appropriately limited to the amount of indebtedness each ultimately paid to acquire the ICAs.

140. At the time of the Transfers, the values of the Properties were two to three times the balance of the Loans, and they far exceeded what the ICA Acquirers or their predecessor, FSL, had paid for the rights to enforce the ICAs.

141. At the time of the Transfers, the Properties were worth at least $12 million.

142. The Transfers were made to the ICA Acquirers without reasonably equivalent value in exchange for such Transfers.

143. The Debtor was rendered insolvent due to the Transfers, as all of its assets and possible income stream was transferred away, rendering it balance sheet insolvent and unable to pay debts as they came due.

144. The Transfers may be avoided pursuant to 11 U.S.C. § 548(a)(1)(B).

145. The ICA Acquirers and Bloomfield were the initial transferees, subsequent transferees, or the entities for whose benefit the Transfers were made, and as a result, the Debtor is entitled to recover property transferred and/or the value transferred, plus such additional amounts and property as may be discovered through this proceeding.

146. If, in the alternative, the Court determines the ICA Demands were not Transfer of property rights, the entry of the Judgements certainly constitute avoidable Transfers.

WHEREFORE, Debtor respectfully requests the Court enter a final judgment in favor of the Debtor and against the ICA Acquirers and Bloomfield, (i) avoiding the Transfers and any other transfer made by Debtor to the ICA Acquirers or Bloomfield within two years of the Petition Date pursuant to § 548(a)(1)(B) of the Bankruptcy Code, and (ii) granting such other and further legal and equitable relief as the Court deems just and proper.

**COUNT II**
**ACTION AGAINST ICA ACQUIRERS AND PURPORTED LENDERS TO AVOID CONSTRUCTIVELY FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(B)**
**(Subordination Agreements)**

147. Paragraphs 1 through 131 are realleged and incorporated by reference.

148. This is an action to avoid a fraudulent transfer of property pursuant to 11 U.S.C. § 548(a)(1)(B).

149. In every state implicated in this Complaint, the Debtor possessed rights of redemption or other equivalent rights to pay off debt subject to a mortgage or deed of trust (the "**Rights of Redemption**"), which would have allowed the Debtor to recover its Properties following the Purported Lenders' demands for payment, but before foreclosure, and in certain cases, even after foreclosure.

150. These Rights of Redemption would allow the Debtor to protect and retain the equity

over and above any outstanding Loan amounts on any of its Properties.

151. The Subordination Agreements, all executed just days before the specific performance demands in favor of the ICA Acquirers, functionally eviscerated the Debtor's valuable Rights of Redemption, as well as any ability to refinance such debt or otherwise effectuate a sale. Essentially, the Subordination Agreements were a forced placed alienation of property that would prevent the issuance of title insurance and therefore transfer of the Property.

152. The Debtor's Rights of Redemption, as well as rights to sell its Properties or refinance secured loans, are property rights belonging to the Debtor.

153. The ICA Acquirers were the transferees of the benefits of the Subordination Agreements.

154. The execution of the Subordination Agreements by the Purported Lenders transferred the benefits of the Rights of Redemption from the Debtor and provided a mechanism whereby only the ICA Acquirers could control and benefit from an exercise of such Rights of Redemption.

155. The Debtor received no reasonably equivalent value for this Transfer and loss of its Rights of Redemption.

156. The Subordination Agreements were an involuntary and unauthorized transfer of the Debtor's Rights of Redemption, orchestrated and effectuated by the ICA Acquirers and Potential Lenders. No true senior secured lender would voluntarily subordinate its rights in this manner if it had a true intention of being repaid on an outstanding loan balance.

157. The Subordination Agreements were executed on about August 4, 2021, on or within 2 years of the Petition Date.

158. At the time of the execution of the Subordination Agreements, the values of the

Properties were two to three times the balance of the Loans, which far exceeded the balance of what the Purported Lenders or ICA Acquirers or their predecessor, FSL, had paid for the rights to enforce the Loans or ICAs.

159. While the Debtor was already insolvent as a result of the ICA Demands, to the extent the Court determines the Transfer of equitable beneficial interests under the ICA Demands did not effectuate a Transfer, the execution of the Subordination Agreements solidified the Debtor's insolvency.

160. The Debtor's insolvency was a result of the execution of the Subordination Agreements and transfer of the Debtor's rights vis a vis the Purported Lenders, due to the Purported Lenders' intentional forfeiture for zero consideration, which usurped, among other things, the Debtor's Rights of Redemption and benefits therefrom. As a result, the Debtor was left balance sheet insolvent and with insufficient remaining assets to utilize to pay its outstanding creditors.

161. The Subordination Agreements may be avoided pursuant to 11 U.S.C. § 548(a)(1)(B) to the extent they impair the Debtor's Rights of Redemption.

162. The ICA Acquirers were the initial transferees, subsequent transferees, or the entities for whose benefit the Subordination Agreements were made, and as a result, the Debtor is entitled to eliminate the Subordination Agreement and/or the value transferred (including the Rights of Redemption and its benefits, (i.e., the equity in the Properties)) plus such additional amounts and property as may be discovered through this proceeding.

WHEREFORE, Debtor respectfully requests the Court enter a final judgment in favor of the Debtor and against the ICA Acquirers, (i) avoiding the Subordination Agreements as fraudulent transfers to the extent they impair the Debtor's Rights of Redemption, and any other transfer made by Debtor to the ICA Acquirers within two years of the Petition Date pursuant to § 548(a)(1)(B)

of the Bankruptcy Code, and (ii) granting such other and further legal and equitable relief as the Court deems just and proper.

**COUNT III**
**AGAINST ICA ACQUIRERS TO RECOVER PROPERTY**
**TRANSFERRED OR VALUE OF SUCH PROPERTY – 11 U.S.C. § 550**

163. Paragraphs 1 through 162 are realleged and incorporated by reference.

164. The Transfers should be avoided as alleged herein in Counts I and II, including but not limited to avoiding the Battle Creek Judgment, the Hines Judgment, and the Subordination Agreements, and all attendant rights, including the Transfers of the Properties.

165. Pursuant to 11 U.S.C. § 550(a), the recovery of property or its value for the benefit of the Debtor's estate is authorized to the extent that any of the Transfers are avoidable under 11 U.S.C. § 548(a)(1).

166. To the extent the Court determines the Debtor is entitled to a claim under § 550, such claim should be adjusted by any receipts of Rents the Debtor is so entitled to receive.

WHEREFORE, Debtor respectfully requests the Court enter a Final Judgment in favor of the Debtor and against the Defendants, (i) avoiding the Transfers; (ii) allowing the Debtor to recover the value of the property transferred, with an adjustment for any Rents received; (iii) awarding monetary relief in the amount of the Transfers; and (iv) granting such other and further relief as the Court deems just and proper.

**COUNT IV**
**AGAINST ICA ACQUISITION BATTLE CREEK, LLC**
**OBJECTION TO CLAIM 11**

167. Paragraphs 1 through 131, 134-166 are realleged and incorporated herein by reference.

168. For the reasons set forth herein, the Court should grant Debtor's relief in Counts 1

through 3 herein and disallow ICA Battle Creek's Claim 11 to the fullest extent permitted by this Court.

169. On October 13, 2023, ICA Battle Creek filed Claim 11 in the Debtor's bankruptcy case.

170. Despite having more than three months in bankruptcy, and years in litigation related to putative claims in state court, ICA Battle Creek failed to formulate a claim amount, as Claim 11 states the amount of the claim is "Unliquidated" and provides no statement itemizing interest, fees, expenses or other charges as required by Bankruptcy Rule 3001(C)(2)(A), even though ICA Battle Creek purports the existence of Claim 11 is based on 4 documents.

171. For the reasons stated herein, Claim 11 should be disallowed for failing to calculate or propose an estimated claim amount within the Claims Bar Date, despite having more than adequate time to do so.

172. Claim 11 should be disallowed for failing to return the Battle Creek Property subject to an avoidance action.

173. To the extent the Court determines that a fraudulent transfer exists and rights to the Battle Creek Property are returned to the Debtor, the Court should limit Claim 11 to any amount ICA Battle Creek ultimately paid for, or to the benefit of, the Debtor.

174. Any possible claim for ICA Battle Creek cannot be duplicative of a claim asserted in Count V, which would result in a double recovery for the same outstanding loan balance, or equivalent amount paid for the benefit of the Debor.

WHEREFORE, the Debtor requests that the Court disallow ICA Battle Creek, LLC's Claim 11 and grant such other and further relief as the Court deems just and proper.

**COUNT V**
**AGAINST FI 135 BATTLE CREEK, LLC**
**OBJECTION TO CLAIM 5**

175. Paragraphs 1 through 131, 134-166 are realleged and incorporated herein by reference.

176. For the reasons set forth herein, the Court should grant Debtor's relief in Counts 1 through 3 herein and should disallow FI 135 Battle Creek's Claim 5 to the fullest extent permitted by this Court.

177. On or about June 17, 2021, FI 135 Battle Creek acquired the Loan secured by the Battle Creek Property from FSL's Subsidiary, Battle Creek RA-357, LLC.

178. On October 13, 2023, FI 135 Battle Creek filed Claim 5 in the Debtor's bankruptcy case.

179. Despite having more than three months in bankruptcy, and years litigation these putative claims in state court, and purporting to be based on a "Deed of Trust" and a "Lease Assignment," Claim 5 states the amount of the claim is "Unliquidated" and provides no statement itemizing interest, fees, expenses or other charges as required by Bankruptcy Rule 3001(C)(2)(A) (despite being based on six (6) documents).

180. Claim 5 should be disallowed for failing to calculate or propose an estimated claim amount within the Claims Bar Date, despite having adequate time to do so.

181. Claim 5 should be disallowed because FI 135 Battle Creek, LLC has failed to state a claim, insofar as any possible claim it could have is only as to the Battle Creek Property Transferred to ICA Battle Creek on or about the date of the ICA Demand. To the extent the Court determines that a fraudulent transfer exists and rights to the Battle Creek Property are returned to the Debtor, FI 135 Battle Creek might be entitled to a claim at such time, but such claim would

need to be amended and asserted following such fraudulent Transfer ruling, and must be limited to any balance, if any, outstanding and unpaid and not otherwise subordinated.

182. Any possible claim for FI 135 Battle Creek cannot be duplicative of a claim asserted in Count IV which would result in a double recovery for the same outstanding Loan balance, or equivalent amount paid for the benefit of the Debor.

WHEREFORE, the Debtor requests that the Court disallow FI 135 Battle Creek's Claim 5 and grant such other and further relief as the Court deems just and proper.

**COUNT VI**
**AGAINST ICA ACQUISITION CASTOR PHILADELPHIA, LLC**
**OBJECTION TO CLAIM 12**

183. Paragraphs 1 through 131, 134-166 are realleged and incorporated herein by reference.

184. For the reasons set forth herein, the Court should grant Debtor's relief in Counts 1 through 3 herein and disallow ICA Castor's Claim 12 to the fullest extent permitted by this Court.

185. On October 13, 2023, ICA Castor filed Claim 12 in the Debtor's bankruptcy case.

186. Despite having more than three months in bankruptcy, and years in litigation related to putative claims in state court, ICA Castor failed to formulate a claim amount, as Claim 12 states the amount of the claim is "Unliquidated" and provides no statement itemizing interest, fees, expenses or other charges as required by Bankruptcy Rule 3001(C)(2)(A), even though ICA Castor purports the existence of Claim 12 is based on 4 documents.

187. For the reasons stated herein, Claim 12 should be disallowed for failing to calculate or propose an estimated claim amount within the Claims Bar Date, despite having more than adequate time to do so.

188. Claim 12 should be disallowed for failing to return the Castor Property subject to

an avoidance action.

189. To the extent the Court determines that a fraudulent transfer exists and rights to the Castor Property are returned to the Debtor, the Court should limit Claim 12 to any amount ICA Castor ultimately paid for, or to the benefit of, the Debtor.

190. Any possible claim for ICA Castor cannot be duplicative of a claim asserted in Count VII, which would result in a double recovery for the same outstanding loan balance, or equivalent amount paid for the benefit of the Debor.

WHEREFORE, the Debtor requests that the Court disallow ICA Castor, LLC's Claim 12 and grant such other and further relief as the Court deems just and proper.

**COUNT VII**
**AGAINST FI 135 CASTOR PHILADELPHIA, LLC**
**OBJECTION TO CLAIM 8**

191. Paragraphs 1 through 131, 134-166 are realleged and incorporated herein by reference.

192. For the reasons set forth herein, the Court should grant Debtor's relief in Counts 1 through 3 herein and should disallow FI 135 Castor's Claim 8 to the fullest extent permitted by this Court.

193. On or about June 17, 2021, FI 135 Castor acquired the Loan secured by the Castor Property from FSL's Subsidiary, Castor RA-357, LLC.

194. On October 13, 2023, FI 135 Castor filed Claim 8 in the Debtor's bankruptcy case.

195. Despite having more than three months in bankruptcy, and years litigation these putative claims in state court, and purporting to be based on a "Deed of Trust" and a "Lease Assignment," Claim 8 states the amount of the claim is "Unliquidated" and provides no statement itemizing interest, fees, expenses or other charges as required by Bankruptcy Rule 3001(C)(2)(A)

(despite being based on six (6) documents).

196. Claim 8 should be disallowed for failing to calculate or propose an estimated claim amount within the Claims Bar Date, despite having adequate time to do so.

197. Claim 8 should be disallowed because FI 135 Castor, LLC has failed to state a claim, insofar as any possible claim it could have is only as to the Castor Property Transferred to ICA Castor on or about the date of the ICA Demand. To the extent the Court determines that a fraudulent transfer exists and rights to the Castor Property are returned to the Debtor, FI 135 Castor might be entitled to a claim at such time, but such claim would need to be amended and asserted following such fraudulent Transfer ruling, and must be limited to any balance, if any, outstanding and unpaid and not otherwise subordinated.

198. Any possible claim for FI 135 Castor cannot be duplicative of a claim asserted in Count VI which would result in a double recovery for the same outstanding Loan balance, or equivalent amount paid for the benefit of the Debor.

WHEREFORE, the Debtor requests that the Court disallow FI 135 Castor Philadelphia's Claim 8 and grant such other and further relief as the Court deems just and proper.

**COUNT VIII**
**AGAINST ICA ACQUISITION HINES, LLC**
**OBJECTION TO CLAIM 13**

199. Paragraphs 1 through 131, 134-166 are realleged and incorporated herein by reference.

200. For the reasons set forth herein, the Court should grant Debtor's relief in Counts 1 through 3 herein and disallow ICA Hines' Claim 13 to the fullest extent permitted by this Court.

201. On October 13, 2023, ICA Hines filed Claim 13 in the Debtor's bankruptcy case.

202. Despite having more than three months in bankruptcy, and years in litigation related

to putative claims in state court, ICA Hines failed to formulate a claim amount, as Claim 13 states the amount of the claim is "Unliquidated" and provides no statement itemizing interest, fees, expenses or other charges as required by Bankruptcy Rule 3001(C)(2)(A), even though ICA Hines purports the existence of Claim 13 is based on 4 documents.

203. For the reasons stated herein, Claim 13 should be disallowed for failing to calculate or propose an estimated claim amount within the Claims Bar Date, despite having more than adequate time to do so.

204. Claim 13 should be disallowed for failing to return the Hines Property subject to an avoidance action.

205. To the extent the Court determines that a fraudulent transfer exists and rights to the Hines Property are returned to the Debtor, the Court should limit Claim 13 to any amount ICA Hines ultimately paid for, or to the benefit of, the Debtor.

206. Any possible claim for ICA Hines cannot be duplicative of a claim asserted in Count IX, which would result in a double recovery for the same outstanding loan balance, or equivalent amount paid for the benefit of the Debor.

WHEREFORE, the Debtor requests that the Court disallow ICA Hines, LLC's Claim 13 and grant such other and further relief as the Court deems just and proper.

**COUNT IX**
**AGAINST FI 135 HINES, LLC**
**OBJECTION TO CLAIM 6**

207. Paragraphs 1 through 131, 134-166 are realleged and incorporated herein by reference.

208. For the reasons set forth herein, the Court should grant Debtor's relief in Counts 1 through 3 herein and should disallow FI 135 Hines' Claim 6 to the fullest extent permitted by this

Court.

209. On or about June 17, 2021, FI 135 Hines acquired the Loan secured by the Hines Property from FSL's Subsidiary, Hines RA-357, LLC.

210. On October 13, 2023, FI 135 Hines filed Claim 6 in the Debtor's bankruptcy case.

211. Despite having more than three months in bankruptcy, and years litigation these putative claims in state court, and purporting to be based on a "Deed of Trust" and a "Lease Assignment," Claim 6 states the amount of the claim is "Unliquidated" and provides no statement itemizing interest, fees, expenses or other charges as required by Bankruptcy Rule 3001(C)(2)(A) (despite being based on six (6) documents).

212. Claim 6 should be disallowed for failing to calculate or propose an estimated claim amount within the Claims Bar Date, despite having adequate time to do so.

213. Claim 6 should be disallowed because FI 135 Hines, LLC has failed to state a claim, insofar as any possible claim it could have is only as to the Hines Property Transferred to ICA Hines on or about the date of the ICA Demand. To the extent the Court determines that a fraudulent transfer exists and rights to the Hines Property are returned to the Debtor, FI 135 Hines might be entitled to a claim at such time, but such claim would need to be amended and asserted following such fraudulent Transfer ruling, and must be limited to any balance, if any, outstanding and unpaid and not otherwise subordinated.

214. Any possible claim for FI 135 Hines cannot be duplicative of a claim asserted in Count VIII which would result in a double recovery for the same outstanding Loan balance, or equivalent amount paid for the benefit of the Debor.

WHEREFORE, the Debtor requests that the Court disallow FI 135 Hines' Claim 6 and grant such other and further relief as the Court deems just and proper.

**COUNT X**
**AGAINST ICA ACQUISITION KREWSTOWN PHILADELPHIA, LLC**
**OBJECTION TO CLAIM 14**

215. Paragraphs 1 through 131, 134-166 are realleged and incorporated herein by reference.

216. For the reasons set forth herein, the Court should grant Debtor's relief in Counts 1 through 3 herein and disallow ICA Krewstown Claim 14 to the fullest extent permitted by this Court.

217. On October 13, 2023, ICA Krewstown filed Claim 14 in the Debtor's bankruptcy case.

218. Despite having more than three months in bankruptcy, and years in litigation related to putative claims in state court, ICA Krewstown failed to formulate a claim amount, as Claim 14 states the amount of the claim is "Unliquidated" and provides no statement itemizing interest, fees, expenses or other charges as required by Bankruptcy Rule 3001(C)(2)(A), even though ICA Krewstown purports the existence of Claim 14 is based on 4 documents.

219. For the reasons stated herein, Claim 14 should be disallowed for failing to calculate or propose an estimated claim amount within the Claims Bar Date, despite having more than adequate time to do so.

220. Claim 14 should be disallowed for failing to return the Krewstown Property subject to an avoidance action.

221. To the extent the Court determines that a fraudulent transfer exists and rights to the Krewstown Property are returned to the Debtor, the Court should limit Claim 14 to any amount ICA Krewstown ultimately paid for, or to the benefit of, the Debtor.

222. Any possible claim for ICA Krewstown cannot be duplicative of a claim asserted

in Count XI, which would result in a double recovery for the same outstanding loan balance, or equivalent amount paid for the benefit of the Debor.

WHEREFORE, the Debtor requests that the Court disallow ICA Krewstown Philadelphia, LLC's Claim 14 and grant such other and further relief as the Court deems just and proper.

**COUNT XI**
**AGAINST FI 135 KREWSTOWN PHILADELPHIA, LLC**
**OBJECTION TO CLAIM 9**

223. Paragraphs 1 through 131, 134-166 are realleged and incorporated herein by reference.

224. For the reasons set forth herein, the Court should grant Debtor's relief in Counts 1 through 3 herein and should disallow FI 135 Krewstown's Claim 9 to the fullest extent permitted by this Court.

225. On or about June 17, 2021, FI 135 Krewstown acquired the Loan secured by the Krewstown Property from FSL's Subsidiary, Krewstown RA-357, LLC.

226. On October 13, 2023, FI 135 Krewstown filed Claim 9 in the Debtor's bankruptcy case.

227. Despite having more than three months in bankruptcy, and years litigation these putative claims in state court, and purporting to be based on a "Deed of Trust" and a "Lease Assignment," Claim 9 states the amount of the claim is "Unliquidated" and provides no statement itemizing interest, fees, expenses or other charges as required by Bankruptcy Rule 3001(C)(2)(A) (despite being based on six (6) documents).

228. Claim 9 should be disallowed for failing to calculate or propose an estimated claim amount within the Claims Bar Date, despite having adequate time to do so.

229. Claim 9 should be disallowed because FI 135 Krewstown, LLC has failed to state

a claim, insofar as any possible claim it could have is only as to the Krewstown Property Transferred to ICA Krewstown on or about the date of the ICA Demand. To the extent the Court determines that a fraudulent transfer exists and rights to the Krewstown Property are returned to the Debtor, FI 135 Krewstown might be entitled to a claim at such time, but such claim would need to be amended and asserted following such fraudulent Transfer ruling, and must be limited to any balance, if any, outstanding and unpaid and not otherwise subordinated.

230. Any possible claim for FI 135 Krewstown cannot be duplicative of a claim asserted in Count X which would result in a double recovery for the same outstanding Loan balance, or equivalent amount paid for the benefit of the Debor.

WHEREFORE, the Debtor requests that the Court disallow FI 135 Krewstown Philadelphia, LLC's Claim 9 and grant such other and further relief as the Court deems just and proper.

**COUNT XII**
**AGAINST ICA ACQUISITION TROY, LLC**
**<u>OBJECTION TO CLAIM 15</u>**

231. Paragraphs 1 through 131, 134-166 are realleged and incorporated herein by reference.

232. For the reasons set forth herein, the Court should grant Debtor's relief in Counts 1 through 3 herein and disallow ICA Troy's Claim 15 to the fullest extent permitted by this Court.

233. On October 13, 2023, ICA Troy filed Claim 15 in the Debtor's bankruptcy case.

234. Despite having more than three months in bankruptcy, and years in litigation related to putative claims in state court, ICA Troy failed to formulate a claim amount, as Claim 15 states the amount of the claim is "Unliquidated" and provides no statement itemizing interest, fees, expenses or other charges as required by Bankruptcy Rule 3001(C)(2)(A), even though ICA Troy

purports the existence of Claim 15 is based on 4 documents.

235. For the reasons stated herein, Claim 15 should be disallowed for failing to calculate or propose an estimated claim amount within the Claims Bar Date, despite having more than adequate time to do so.

236. Claim 15 should be disallowed for failing to return the Troy Property subject to an avoidance action.

237. To the extent the Court determines that a fraudulent transfer exists and rights to the Troy Property are returned to the Debtor, the Court should limit Claim 15 to any amount ICA Troy ultimately paid for, or to the benefit of, the Debtor.

238. Any possible claim for ICA Troy cannot be duplicative of a claim asserted in Count XIII, which would result in a double recovery for the same outstanding loan balance, or equivalent amount paid for the benefit of the Debor.

WHEREFORE, the Debtor requests that the Court disallow ICA Troy, LLC's Claim 15 and grant such other and further relief as the Court deems just and proper.

## COUNT XIII
## AGAINST FI 135 TROY, LLC
## OBJECTION TO CLAIM 7

239. Paragraphs 1 through 131, 134-166 are realleged and incorporated herein by reference.

240. For the reasons set forth herein, the Court should grant Debtor's relief in Counts 1 through 3 herein and should disallow FI 135 Troy's Claim 7 to the fullest extent permitted by this Court.

241. On or about June 17, 2021, FI 135 Troy acquired the Loan secured by the Troy Property from FSL's Subsidiary, Troy RA-357, LLC.

242. On October 13, 2023, FI 135 Troy filed Claim 7 in the Debtor's bankruptcy case.

243. Despite having more than three months in bankruptcy, and years litigation these putative claims in state court, and purporting to be based on a "Deed of Trust" and a "Lease Assignment," Claim 7 states the amount of the claim is "Unliquidated" and provides no statement itemizing interest, fees, expenses or other charges as required by Bankruptcy Rule 3001(C)(2)(A) (despite being based on six (6) documents).

244. Claim 7 should be disallowed for failing to calculate or propose an estimated claim amount within the Claims Bar Date, despite having adequate time to do so.

245. Claim 7 should be disallowed because FI 135 Krewstown, LLC has failed to state a claim, insofar as any possible claim it could have is only as to the Krewstown Property Transferred to ICA Krewstown on or about the date of the ICA Demand. To the extent the Court determines that a fraudulent transfer exists and rights to the Krewstown Property are returned to the Debtor, FI 135 Troy might be entitled to a claim at such time, but such claim would need to be amended and asserted following such fraudulent Transfer ruling, and must be limited to any balance, if any, outstanding and unpaid and not otherwise subordinated.

246. Any possible claim for FI 135 Troy cannot be duplicative of a claim asserted in Count XII which would result in a double recovery for the same outstanding Loan balance, or equivalent amount paid for the benefit of the Debor.

WHEREFORE, the Debtor requests that the Court disallow FI 135 Troy, LLC's Claim 7 and grant such other and further relief as the Court deems just and proper.

**COUNT XIV**
**AGAINST ICA ACQUISITION BALTIMORE, LLC**
**<u>OBJECTION TO CLAIM 10</u>**

247. Paragraphs 1 through 131, 134-166 are realleged and incorporated herein by

reference.

248. For the reasons set forth herein, the Court should grant Debtor's relief in Counts 1 through 3 herein and disallow ICA Baltimore's Claim 10 to the fullest extent permitted by this Court.

249. On October 13, 2023, ICA Baltimore filed Claim 10 in the Debtor's bankruptcy case.

250. Despite having more than three months in bankruptcy, and years in litigation related to putative claims in state court, ICA Baltimore failed to formulate a claim amount, as Claim 10 states the amount of the claim is "Unliquidated" and provides no statement itemizing interest, fees, expenses or other charges as required by Bankruptcy Rule 3001(C)(2)(A), even though ICA Baltimore purports the existence of Claim 10 is based on 4 documents.

251. For the reasons stated herein, Claim 10 should be disallowed for failing to calculate or propose an estimated claim amount within the Claims Bar Date, despite having more than adequate time to do so.

252. Claim 10 should be disallowed for failing to return the Baltimore Property subject to an avoidance action.

253. To the extent the Court determines that a fraudulent transfer exists and rights to the Baltimore Property are returned to the Debtor, the Court should limit Claim 10 to any amount ICA Baltimore ultimately paid for, or to the benefit of, the Debtor.

254. Any possible claim for ICA Baltimore cannot be duplicative of a claim asserted in Count XV, which would result in a double recovery for the same outstanding loan balance, or equivalent amount paid for the benefit of the Debor.

WHEREFORE, the Debtor requests that the Court disallow ICA Baltimore, LLC's Claim

10 and grant such other and further relief as the Court deems just and proper.

**COUNT XV**
**AGAINST FI 135 BALTIMORE, LLC**
**<u>OBJECTION TO CLAIM 4</u>**

255. Paragraphs 1 through 131, 134-166 are realleged and incorporated herein by reference.

256. For the reasons set forth herein, the Court should grant Debtor's relief in Counts 1 through 3 herein and should disallow FI 135 Baltimore's Claim 4 to the fullest extent permitted by this Court.

257. On or about June 17, 2021, FI 135 Baltimore acquired the Loan secured by the Baltimore Property from FSL's Subsidiary, Baltimore RA-357, LLC.

258. On October 13, 2023, FI 135 Baltimore filed Claim 4 in the Debtor's bankruptcy case.

259. Despite having more than three months in bankruptcy, and years litigation these putative claims in state court, and purporting to be based on a "Deed of Trust" and a "Lease Assignment," Claim 4 states the amount of the claim is "Unliquidated" and provides no statement itemizing interest, fees, expenses or other charges as required by Bankruptcy Rule 3001(C)(2)(A) (despite being based on six (6) documents).

260. Claim 4 should be disallowed for failing to calculate or propose an estimated claim amount within the Claims Bar Date, despite having adequate time to do so.

261. Claim 4 should be disallowed because FI 135 Krewstown, LLC has failed to state a claim, insofar as any possible claim it could have is only as to the Krewstown Property Transferred to ICA Krewstown on or about the date of the ICA Demand. To the extent the Court determines that a fraudulent transfer exists and rights to the Krewstown Property are returned to

the Debtor, FI 135 Baltimore might be entitled to a claim at such time, but such claim would need to be amended and asserted following such fraudulent Transfer ruling, and must be limited to any balance, if any, outstanding and unpaid and not otherwise subordinated.

262. Any possible claim for FI 135 Baltimore cannot be duplicative of a claim asserted in Count XVI which would result in a double recovery for the same outstanding Loan balance, or equivalent amount paid for the benefit of the Debor.

WHEREFORE, the Debtor requests that the Court disallow FI 135 Baltimore's Claim 4 and grant such other and further relief as the Court deems just and proper.

**COUNT XVI**
**AGAINST ICA ACQUIRERS AND PURPORTED LENDERS-**
**EQUITABLE SUBORDINATION 11 U.S.C. § 510(C)**

263. Paragraphs 1 through 131 are realleged and incorporated by reference.

264. To the extent that ICA Acquirers and/or Purported Lenders have allowed claims, they should be subordinated to other claims and interests of the Estate to the fullest extent permitted and justified to this Court by equity.

265. As set forth herein, the ICA Acquirers and Purported Lenders have engaged in inequitable conduct in attempting to usurp the Debtor's equity in the Properties.

266. Specifically, the ICA Acquirers' and Purported Lenders' actions set forth herein, including but not limited to preventing payoff of the Loans, voluntarily subordinating the Purported Lenders' payment rights to prevent refinancing or payoff, and then indicating they would return any payments of the asserted debt, while purportedly holding secured claims, subordinating their rights for zero consideration to the ICA Acquirers or the Debtor, working with the same counsel to acquire a default in favor of and ICA Acquirer by counsel for an Purported Lender without notifying Plaintiff's counsel (defendants in the State Court) of the pendency of the

default motion, and overall attempts to usurp Debtor's Properties' value, all of which have resulted in injury to the creditors of the Debtor's estate, equity holders of the Debtor's estate, and to the Debtor itself, insofar as the Properties' value was wholly lost to the benefit of the entire Debtor's estate.

267. But for the ICA Acquirers' and Purported Lenders' actions, including but not limited to entering into Subordination Agreements which usurped the Debtor's rights of redemption and preventing refinancing of the Loans by third parties, feigning ignorance of the Debtor's right to repay, thwarting the Debtor's payment efforts, and feigning collection efforts in favor of the Purported Lenders, the Debtor would be solvent, could pay all creditors in full (including the Purported Lenders to the extent they hold claims), and would not be in this Chapter 11 bankruptcy case.

268. Additionally, the ICA Acquirers' and Purported Lenders' actions have conferred an unfair advantage on the ICA Acquirers and Purported Lenders in that the Purported Lenders could have been entitled to receive the Loan balances, but instead the ICA Acquirers have usurped the equity in the Properties worth far more through their unusual and conspiring tactics.

269. Equitable subordination is not inconsistent with the provision of the Bankruptcy Code as set forth in 11 U.S.C. § 101 et seq and is specifically permitted by Section 510(C).

270. Pursuant to 11 U.S.C. § 510, this Court should equitably subordinate all of the Purported Lenders' and ICA Acquirers' claims to other claims and interests of the Estate to the fullest extent found equitable by this Court. Having worked in concert and collectively attempted to steal Debtor's equity, sufficient and justifiable grounds exist to subordinate the ICA Acquirers' and Purported Lenders' claims to equity in the Debtor, who was harmed by this misconduct.

**WHEREFORE**, Debtor respectfully requests the Court subordinate any allowed portions

of the claims of ICA Acquirers and Purported Lenders above the amount of the Loans to the other claims and equity interests of the Estate to the extent necessary to prevent harms to the Debtor or its estate.

Dated: December 7, 2023.

Respectfully submitted,

/s/ Thomas M. Messana
Thomas M. Messana
Florida Bar Number 991422
Scott A. Underwood
Florida Bar Number 0730041
Megan W. Murray
Florida Bar Number 0093922
Underwood Murray, P.A.
100 N. Tampa St., Suite 2325
Tampa, FL 33602
Tel: (813) 540-8401 / Fax: (813) 553-5345
Email: tmessana@underwoodmurray.com
sunderwood@underwoodmurray.co
mmmurray@underwoodmurray.com
Counsel to the Debtor