**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

In re: Chapter 11

PVP KREWSTOWN, LLC, Case No. 23-16198-MAM

Debtor. /

PVP KREWSTOWN, LLC,

Plaintiff, Adv. No. 23-1254-MAM

v.

ICA ACQUISITION KREWSTOWN, LLC, et al.

Defendants.
/

**DEFENDANTS' MOTION TO DISMISS COMPLAINT**

Defendants, by and through undersigned counsel, pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6), made applicable herein pursuant to Federal Rule of Bankruptcy Procedure 7012(b), move (the "**Motion**") to dismiss the Complaint [ECF No. 1] (the "**Complaint**") filed by the PVP Krewstown, LLC (the "**Debtor**") on December 7, 2023.

**Summary**

The Complaint seeks to avoid as fraudulent, transfers that were bargained and paid for pursuant to valid, binding, and enforceable agreements executed late last century. The Complaint seeks this relief *not* to pay non-insider creditors but, rather, to benefit the Debtor's equity – whose affiliates are the counter-parties to those same valid, binding, and enforceable agreements. In bankruptcy cases, context matters. Here, with no real non-insider creditors, it strains credulity to suggest that this purely two-party dispute is a proper use of the resources and power of this Court. The Court should dismiss the adversary complaint for the reasons set forth below, and the Court should dismiss the underlying bankruptcy case as a bad faith filing.[1]

[1] Defendants adopt the arguments made in their *Motion to Dismiss Bankruptcy Case under 11 U.S.C. § 1112(b)* [Main Case ECF No. 55] ("Main Case Motion to Dismiss") including that this Court lacks subject

As to the merits, the unambiguous terms of the same valid, binding, and enforceable agreements, unqualifiedly establish that the relevant transfers concerning the putative interests at issue – the contractual obligation to transfer the properties and, then, the *actual* transfer of equitable/beneficial title to the properties – were made on August 28, 1998, and September 14, 2020, respectively. Both dates are outside of the two-year look back period of 11 U.S.C. § 548. For that simple reason, the Complaint fails to state a claim upon which relief may be granted.

## **Background**

*The Parties and Relevant Role in the Transactions at Issue*

1. Debtor is the putative successor-in-interest to the rights and obligations of the buyers/borrowers in the transactions described below.

2. The "**Lender Defendants**" include defendants FI 135 Krewstown Philadelphia, LLC, FI 135 Castor Philadelphia, LLC, FI 135 Troy, LLC, FI 135 Battle Creek, LLC, FI135 Hines, LLC, and FI 135 Baltimore LLC, each of which succeeded to the interests of the original lender in August of 2021.

3. The "**ICA Defendants**" include defendants ICA Acquisition Krewstown, LLC, ICA Acquisition Castor, LLC, ICA Acquisition Troy, LLC, ICA Acquisition Battle Creek, LLC, ICA Acquisition Hines, LLC, and ICA Acquisition Baltimore, LLC, each of which succeeded to the interests of the residual value insurers described below.[2]

---

matter jurisdiction over the underlying bankruptcy case and, consequently, this adversary proceeding. Defendants do not waive any argument made in the Main Case Motion to Dismiss.

[2] The Complaint identifies no transfer of property to Defendant Bloomfield Capital Asset Management, LLC. For that reason, Count I must be dismissed as to Defendant Bloomfield. Nor does the Complaint state a plausible predicate for liability of Defendant Bloomfield under 11 U.S.C. § 550, instead it merely lumps Defendant Bloomfield into Count III along with all of the Defendants. For that reason, Count III must be dismissed as to Defendant Bloomfield. *In re Int'l Management Assoc.*, 399 F.3d 1288, 1294 (11th Cir. 2005)(rejecting an unquantifiable and un-correlated "benefit" as being a cognizable claim under 11 U.S.C. § 550(a)(1)). No other count of the Complaint seeks relief from Defendant Bloomfield.

4. For ease of reading, Debtor, Lender and ICA Defendants will be attributed with all relevant acts in all instances regardless of whether the acts were performed by their respective predecessors-in-interest.

*Nature of the Transactions at Issue*

5. On or about August 28, 1998, the Debtor's affiliates (which the Debtor claims were merged into it) purchased six properties located in Michigan, Maryland, Oregon, and Pennsylvania (each a "**Property**" and, together, the "**Properties**") from Rite Aid Corporation. *Complaint*, at ¶¶ 22-23. In connection with the sales, Rite Aid agreed to lease the Properties back from the Debtor and its affiliates through triple net bond lease agreements. *Id.* at ¶ 36. The Debtor financed the full purchase price for each Property by entering into non-recourse loan agreements (each a "**Loan**" and together, the "**Loans**") with the Lender Defendants. *Id.* at ¶¶ 26, and Exhibit E.[3] The Loans, in turn, were memorialized by notes and secured by mortgages (or trust deeds, depending on applicable state law) encumbering the Properties. *Id.* at ¶ 28, and Exhibit E. The Loans were further secured by assignments of leases and rents in favor of the Lender Defendants. *Id.* The "Loan Documents," referenced in paragraph 28 of the Complaint, also include Consent Agreements by and among Rite Aid, Debtor, and Lender Defendants (collectively, the "Consent Agreements"). The Consent Agreements provide that all Rite Aid rents were payable directly to the Lender Defendants and that the Debtor would not provide contrary instructions.[4]

[3] On a motion to dismiss, "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c).

[4] *See Main Case Motion to Dismiss*, at Exhibit A. Under this structure, which was common for credit-tenant loan transactions at the time, the Debtor contributed no equity to acquire the Properties at closing. Furthermore, the Debtor had no operational obligations after closing, as the tenant was solely responsible under the triple-net bond lease for maintaining the Properties, and the tenant paid all rents directly to the Lender Defendant in satisfaction of the Debtor's obligations under the Loans. Accordingly, the Debtor was a true shell entity and never had any employees or even so much as a bank account. Ownership of the Debtor, however, carried with it certain immediate tax benefits, including the right to deduct depreciation and loan expenses.

6. As a condition of making the Loans, the Lender Defendants required the Debtor to purchase credit-insurance known as residual value insurance policies (each a "**Policy**" and together, the "**Policies**") for the benefit of Lender. *Id.* at ¶ 37. As Debtor described in pre-petition litigation with the Lender and ICA Defendants, a residual value insurance policy --

> ... is a risk management tool that asset-based lenders sometimes use to manage the risk that their collateral will depreciate faster than projected or will unexpectedly decline in value as a result of unexpected macroeconomic forces or other events and causes, such as, for example, a global pandemic.

Main Case ECF No. 57, Exhibit A, page 2.[5] Obtaining the Policies also enabled Debtor to obtain more favorable financing terms from the Lender Defendants. *Main Case Motion to Dismiss,* p. 9.

7. Debtor purchased the Policies on the Properties from the ICA Defendants to satisfy this condition to obtaining the Loans. *Complaint* at ¶ 37. Pursuant to the Policies, the ICA Defendants unconditionally guaranteed – like a letter of credit – that it would pay to the Lender Defendants a sum certain on each Loan at maturity (the "Insured Value") in the event Debtor failed to pay the Insured Value for any reason whatsoever. Exhibit E, at Section 2.02(r); and *Complaint*, at ¶ 37.[6] The original Loan amount and Insured Value of each Property is as follows:

| Property | Original Loan Amount | Insured Value |
|---|---|---|
| 4604 Hartford Road<br>Baltimore, Maryland | $2,597,956.67 | $956,525 |
| 627 North Highway 20<br>Hines, Oregon | $2,379,222.11 | $666,793 |
| 7972 Castor Avenue<br>Philadelphia, Pennsylvania | $2,276,266.46 | $911,625 |
| 9280 Krewstown Road<br>Philadelphia, Pennsylvania | $2,692,406.67 | $986,040 |
| 2971 Maple Road | $4,298,868.26 | $1,785,457 |

[5] The court may take judicial notice of matters in the public record, including any court filings because the materials are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *In re First NLC Fin. Servs., LLC*, 410 B.R at 729; see also Fed. R. Evid. 201.

[6] Specifically, each Policy provided that: "If a claim is payable under this Policy, such payment will be made notwithstanding the fact that the Insured has become subject of a voluntary or involuntary proceeding under applicable bankruptcy laws. Such obligation to make payment is unconditional, and the [Insurer] waives any right of set-off, counterclaim or deduction with respect thereto." *See Complaint, Exhibit A*, at Article VII.

| | | |
|---|---|---|
| Troy, Michigan | | |
| 1434 W. Michigan Avenue Battle Creek, Michigan | $3,108,703.28 | $941,741 |

Id. at ¶¶ 29-34 and 40.

8. In consideration for the ICA Defendants' unconditional credit support of the Loans made to finance the acquisition of the Properties, the Debtor executed Insured Covenant Agreements (each and "**ICA**" and together, the "**ICAs**") in favor of the ICA Defendants. *Complaint*, at ¶ 38, and Exhibit B.

9. Under the ICAs, if Debtor desired to retain ownership of the Properties, Debtor could pay off or refinance the Loans at or before maturity. Exhibit B, ¶ 2. However, by executing the ICAs, the Debtor expressly and unconditionally agreed to transfer title to the Properties to the ICA Defendants in the event that (i) it failed to pay the Loans at maturity and (ii) the ICA Defendants paid the Insured Values to the Lender Defendants. The ICAs considered those events as a closing on the purchase of the Properties with legal title passing after the fact. The Recitals to ICAs state, in relevant part:

> [ICA Defendant] has issued a Residual Value Insurance Policy, which Policy includes an Additional Named Insured Endorsement … relating to the Property, pursuant to which [ICA Defendant] has agreed, among other things, … that it will pay the … [Lender Defendant} … an amount equal to the "Insured Value" … in the event that the Note is not repaid in full by the owner on or before the Termination Date.
>
> ….
>
> [Debtor] has agreed that if [ICA Defendant] makes payment in full to the [Lender Defendant] pursuant to Articles I and V of the Policy and the Additional Named Insured Endorsement to the Policy, the Property will immediately be transferred to [ICA Defendant] for no additional consideration other than such payment to the [Lender Defendant] pursuant to the Policy.

*See Complaint*, *Exhibit B*, p. 1, at Recitals 4 and 6. Each ICA further provided that:

> Transfer of Title.
>
> In the event that [ICA Defendant] makes payment for a Claim under

> Articles I and V of the Policy, the [Debtor] shall cause the deed to the Property to be immediately delivered to [ICA Defendant], without payment of additional consideration by [ICA Defendant]. [Debtor] hereby acknowledges that payment by [ICA Defendant] under the policy is the equivalent of a purchase of the Property by [ICA Defendant] for an amount equal to the amount paid under the Policy and used in satisfying all or part of [Debtor's] obligations under the Note, and that such payment constitutes full and fair consideration for the transfer of title of the Property to [ICA Defendant].

*Id.*, at p. 2, Section 4(a).

10. By all indications, after these transactions closed in 1998, the mechanics evidenced by loan documents functioned as intended. *Complaint*, generally.

11. Then the Loans came due.

*The Loans Mature, Debtor Defaults, and Subsequent Years of State Court Litigation*

12. On September 1, 2020, when the Loans came due, Debtor defaulted by failing to make the balloon payments due to the Lender Defendants. *Complaint*, at ¶¶ 48 and 49. Consequently, after receipt of notice from the Lender Defendants, on September 14, 2020, the ICA Defendants paid the Insured Values to the Lender Defendants in satisfaction of the obligations they undertook in the Policies in 1998. *Id.* at ¶ 50.

13. Unlike the ICA Defendants, however, the Debtor failed and refused to honor its obligations under the ICAs after the ICA Defendants paid the Insured Values to the Lender Defendants under the Policies. Specifically, contrary to the obligations in the ICAs cited in paragraph 9 above, Debtor failed and refused to transfer title to the Properties to ICA Defendants after the ICA Defendants paid the agreed purchase price (i.e. paid the Insured Values to the Lender Defendants) for the Properties under the ICAs on September 14, 2020. *Id.* at 88. This ultimately resulted in multiple litigation proceedings where (i) the ICA Defendants sought compel Debtor's obligation to deliver titles to the Properties and (ii) the Debtor sought to declare the ICAs void and

unenforceable (among other relief). A summary of the litigation relevant to this Motion and dispositions that govern are as follows:[7]

| Case & Location | Disposition |
|---|---|
| *RA2 Troy, L.L.C. v. FI 135 Troy, LLC* (Michigan Court of Appeals) - Main Case ECF No. 57, Exhibit A. | Dismissal of Debtor's claims affirmed on appeal |
| *PVP Aston, LLC, et al. v. Fin. Structures Ltd., et al.* (State Court, Delaware) - Main Case ECF No. 57, Exhibit B, | Debtor affiliate claims dismissed |
| *RA2 Troy, L.L.C. v. FI 135 Troy, LLC, and ICA Acquisition Troy, LLC*, Case No. 21-189427-CB (Circuit Court for Oakland County, Michigan) - Main Case ECF No. 57, Exhibit C. | Debtor claims dismissed |
| *TJV Associates LLC v. RA2 Boise-Overland L.L.C., et al.*, (Idaho State Court) - Main Case ECF No. 57, Exhibit E. | Summary judgment granted to Lender and ICA parties |
| *Allerand FS Investco, LLC v. RA03 Pittsfield Remainderco, LLC* (Delaware Chancery Court) Main Case ECF No. 57, Exhibit F. | Debtor affiliate claims dismissed |
| *RA2 Battle Creek, L.L.C. v. FI 135 Battle Creek, LLC, and ICA Acquisition Battle Creek, LLC*, Case No. 21-2196-CB (Circuit Court for Calhoun, County Michigan) | Debtor claims dismissed |
| *FI 135 Krewstown Philadelphia, LLC v. 98 RA2 Philadelphia-Krewstown LP* (Case No. 220202251); *FI 135 Castor Philadelphia, LLC v. 98 RA2 Philadelphia-Castor LP* (Case No. 220202252); *PVP Krewstown LLC and PVP Castor LLC v. ICA Acquisition Krewstown and ICA Acquisition Castor LLC* (Case No. 211001566) (First Judicial District of | Consolidated litigation; summary judgment granted to Lender and ICA Defendants |

[7] Depending upon the context, one or more doctrines of estoppel apply to bar any challenge to these findings. "Federal courts will apply the law of the state in which they sit with respect to the doctrine of res judicata." *W. Grp. Nurseries, Inc. v. Ergas*, 211 F. Supp. 2d 1362, 1368 (S.D. Fla. 2002). Under Florida law, res judicata requires: 1) identity in the things sued for; 2) identity of cause of action; 3) identity of persons and parties to the action; and 4) identity of the quality of the person for or against whom the claim is made. *Peeples v. Peeples*, 871 So. 2d 945, 946 (Fla. 1st DCA 2004). "Under res judicata, a party is barred from re-litigating all matters previously raised and determined as well as all other matters that could have been raised." *Chavez v. Tower Hill Signature Ins. Co.*, 278 So. 3d 231, 236 (Fla. 3d DCA 2019), *reh'g denied* (Sept. 19, 2019), *review denied*, No. SC19-1681, 2020 WL 696845 (Fla. Feb. 11, 2020). "Collateral estoppel prevents re-litigation of an issue resolved in a prior judicial proceeding, provided that (1) the identical issue has been fully litigated, (2) by the same parties, and (3) a final decision has been rendered by a court of competent jurisdiction." *Cmty. Bank of Homestead v. Torcise*, 162 F.3d 1084, 1086 (11th Cir. 1998). "Collateral estoppel applies even when a present and former cause of action are different and it bars relitigation of specific issues—'that is to say points and questions'—that were actually litigated and decided in the former suit." *Zikofsky*, 904 So. 2d at 525 (Fla. 4th DCA 2005). Debtor may argue it has appealed numerous decisions from various state court actions now stayed by this proceeding. However, "[u]nder Florida law, a judgment entered by a court of competent jurisdiction has preclusive effect notwithstanding a pending appeal." *CCB, LLC v. BankTrust*, 552 F. App'x 963, 965 (11th Cir. 2014).

| Case & Location | Disposition |
|---|---|
| Pennsylvania, Court of Common Pleas of Philadelphia County, Pennsylvania) | |
| *AUBSP Ownerco 14, LLC v. FI 135 Waynesboro, LLC*, Case No. CL21000254-00 (Circuit Court of Waynesboro, Virginia) | Lender Defendant authorized to foreclose |
| *TJV Associates LLC v. RA2 Bishop L.L.C., Bridge Financial Services, LLC; RA2 Bishop, L.L.C. v. TJV Associates, LLC, 487 Morris Associates LLC, Michael R. Katz, WT Capital Lender Services, Thrifty Payless, Inc., and Bridge Financial Services, LLC, Case No. SI CV CV2166605 (Superior Court for Inyo County, California)* | Lender Defendant authorized to foreclose |
| *PVP Aston, LLC, et al v US Bank Nat Assoc, et al, 2023 WL 525059 (Del Sup Ct, Jan 24, 2023) (Superior Court of Delaware)* | Debtor claims dismissed |
| *ICA Acquisition Battle Creek, LLC v. RA2 Battle Creek, L.L.C. aka AUBSP Ownerco 13, LLC;* Calhoun County, Michigan Circuit Court, Case No. 2022-2605-CB | Summary judgment granted to the ICA Defendant |

Then, on August 4, 2023 (the "Petition Date"), nearly three years after the ICA Defendants purchased equitable and beneficial title to the Properties pursuant the ICAs and applicable state law, as described below, Debtor filed the underlying bankruptcy case.

**The Complaint**

14. The Complaint asserts a variety of claims against the Defendants which can be summarized as follows: (i) Counts I through III seek to set aside and recover alleged "Transfers" of the "equitable beneficial interests" and "rights of redemption" related to the Properties pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550; (ii) Counts IV through XV assert objections to the proofs of claim filed by the Lender and ICA Defendants; and (iii) Count XVI seeks to equitably subordinate the claims of the Lender and ICA Defendants pursuant to 11 U.S.C. § 510(c).

15. The Complaint should be dismissed for numerous reasons. First, the Court does not have subject matter jurisdiction over this adversary proceeding or the underlying bankruptcy case for the reasons stated in the Main Case Motion to Dismiss. Second, Counts I through III of the Complaint fail to state a claim upon which relief may be granted because Debtor has failed to identify a transfer of property within two years of the Petition Date. Moreover, even assuming a

transfer of property occurred within two years of the Petition Date (it did not), Debtor has failed to set aside the obligation to make such transfer, which obligation was undertaken by the Debtor twenty-five years prior to the Petition Date. And, third, substantively, the remaining counts are rendered moot by the Debtor's inability to recover on Counts I through III as those counts are the entire means of implementing the Debtor's plan of reorganization.

**The Court Lacks Subject Matter Jurisdiction over the Complaint**

16. The Court's subject matter jurisdiction is a "threshold question." *U.S. v. Salmona*, 810 F.3d 806, 810 (11th Cir. 2016) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). "[A] court should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings." *Univ. of S. Alabama v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999). On December 1, 2023, the Lender and ICA Defendants filed their Main Case Motion to Dismiss which, in part, is premised upon Debtor's lack of authority to file the underlying bankruptcy case. As a result, the Court lacks subject jurisdiction over the Debtor, its assets, and the underlying bankruptcy case. For the same reason set forth in the Main Case Motion to Dismiss, adopted as if more fully set forth herein, the Court lacks subject matter jurisdiction over this adversary proceeding and the Court should dismiss the Complaint pursuant to Rule 12(b)(1), Fed. R. Civ. P.

**The Complaint Fails to State a Claim upon which Relief can be Granted**

*Standard of Review*

17. A motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., made applicable to this adversary proceeding by Rule 7012, Fed. R. Bankr. P., is the proper means for challenging the Complaint's legal sufficiency. The Rule 12(b)(6) standard was described by the United States Supreme Court in In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and its "sister" decision, *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). *Twombly* and *Iqbal* require, among other things, a two-part analysis of the

Complaint under Rule 12(b)(6): *first*, all legal conclusions and formulaic recitations of claims must be stripped away and discarded; and, *second*, the remaining factual averments must be examined to determine if they are sufficient to plausibly state the claim. Moreover, the Supreme Court stated, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1940. The Eleventh Circuit Court of Appeals, in recognition of *Twombly* and *Iqbal*, has summarized the applicable standard as follows:

> To survive a motion to dismiss, a complaint need not contain detailed factual allegations, but it must contain sufficient factual allegations to suggest the required elements of a cause of action. A formulaic recitation of the elements of a cause of action will not do. Nor will mere labels and legal conclusions withstand a 12(b)(6) motion to dismiss.

*Mukamal v. Bakes*, 378 F. Appx. 890, 896 (11th Cir. 2010), *cert. denied*, 563 U.S. 904, 131 S.Ct. 1785 (2011).

*The Complaint Fails to Identify a Transfer within 2 Years of the Petition Date*

18. The lead claims in the Complaint seek to avoid as constructively fraudulent transfers (i) letters sent by the ICA Defendants to Debtor demanding that it provide deeds to the Properties to the ICA Defendants pursuant to the terms of the ICAs (Count I) and (ii) subordination agreements between the ICA Defendants and the Lender Defendants confirming that the rights under the Loans are subordinate to the rights under the ICAs (Count II).

19. To avoid a transfer as constructively fraudulent transfer under Bankruptcy Code, the Debtor must show, among other things, that a transfer of Debtor's property occurred within two years of the Petition Date. 11 U.S.C.A. § 548(a)(1)(B). Debtor cannot establish this element and, therefore, Counts I and II must be dismissed.

*The Demand Letters did not effectuate Transfers under Applicable State Law*

20. In regard to the letters that the ICA Defendants sent to Debtor demanding title to the Properties in accordance with the ICAs, the Complaint alleges that:

> … on August 6, 2021, (for the Troy Property and the Battle Creek Property), and August 9, 2021 (for Krewstown, Castor, Hines and Baltimore Properties) … the ICA Acquirers sent Notices of Default and Demand for Deed ("**ICA Demand**") under the ICAs, indicating that the Debtor had "the immediate obligation to transfer [each] Property to the undersigned as assignee under the [ICA] Agreement …" (collectively, as to each Property, the "**Transfers,**"…).

*Complaint*, at ¶ 88.

21. Thereafter, in Count I of the Complaint, Debtor alleges that "[t]he Transfers (effective on August 6 and August 9, 2021 as applicable to each Property, effectuated when the ICA [Defendants] made demand for specific performance and turnover of the Properties, thereby transferring the equitable beneficial interests in the Properties) were made within two (2) years of the Petition Date" *Id.* at ¶ 134.

22. There is no support for the Debtor's contention that a demand letter to comply with the terms of a valid, binding, and enforceable contractual obligation entered into twenty-five years before the issuance of the subject demand letter effectuates a transfer of property rights. Particularly here, where those same contracts – the ICAs – plainly and unambiguously state that the *payment* of the Insured Values under the Policies is the equivalent of the purchase of the Properties. *See* Exhibit B, at p. 2, Section 4(a). Debtor admits that payment of the Insured Values were made under the Policies to the Lender Defendants on September 14, 2020, more than two years prior to the Petition Date. *Complaint*, at ¶ 50. As a general rule, clear and unambiguous contract terms should be given their plain, ordinary and generally accepted meaning. *See Chabad of Key Biscayne, Inc. v. Scottsdale Insurance Co.* 2023 WL 4399990 (11th Cir. 2023)(Florida law).[8]

23. Moreover, as a matter of applicable state law, equitable/beneficial ownership of the Properties transferred to the ICA Defendants under the ICAs on September 14, 2020, upon

[8] *Accord Klapp v. United Ins. Group Agency, Inc.*, 468 Mich 459 (2003) (**Michigan**); *Nova Rsch., Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 952 A.2d 275 (2008) (**Maryland**); *Allstate Fire & Cas. Ins. Co. v. Hymes*, 2011 PA Super 200, 29 A.3d 1169, 1172 (2011) (**Pennsylvania**); and *Inglis v. Gen. Cas. Co. of Am.*, 211 Or. 116, 118, 316 P.2d 546, 547 (1957) (**Oregon**).

payment of the Insured Values to the Lender Defendants pursuant to the Policies. As of September 14, 2020, more than two years prior to the Petition Date, the Debtor retained bare legal title to the Properties.[9]

24. But even assuming, *arguendo*, that the demand letters did effect a transfer of the Properties on August 6 and 9, 2021, as Debtor has alleged, such transfers would remain unrecoverable because in order to obtain the Loans, the Debtor executed the ICAs and became obligated to transfer the Properties in 1998 in consideration for the ICA Defendants issuing the Policies to the Lender Defendants upon payment of the Insured Values to the Lender Defendants.

25. An obligation arises when it is legally binding under applicable non-bankruptcy law. *In re Advanced Telecomm Network, Inc.*, 490 F.3d 1325, 1331-32 (11th Cir. 2007) (obligation

---

[9] **As to Michigan:** "[I]t is well-settled that the execution of a purchase agreement transfers an interest in property." *See Lake Forest Partners 2, Inc v Dep't of Treasury*, 271 Mich App 244, 249; 720 NW2d 770, 773 (2006), *rev'd in part on other grounds*, 480 Mich 1046; 743 NW2d 881 (2008) (citing supporting cases). The execution of a land contract triggers application of the doctrine of equitable conversion. *See Charter Twp. of Pittsfield v. Saline*, 103 Mich.App. 99, 302 N.W.2d 608 (1981)). Equitable title to the real estate passes to the vendee or purchaser, while legal title remains in the vendor or seller as security for the payment of the purchase price. *See Barker v. Klingler*, 302 Mich. 282, 4 N.W.2d 596, 599 (1942) (discussing equitable conversion in context of an ejectment action); *Hooper v. Van Husan*, 105 Mich. 592, 63 N.W. 522, 523 (1895). When the vendee pays the purchase price in full, the vendee becomes entitled to a conveyance of legal title. *Barker*, 4 N.W.2d at 599; see also *Steward v. Panek*, 251 Mich.App. 546, 652 N.W.2d 232, 238 (2002) ("[A] buyer who performs under a land contract (i.e., pays in full) acquires equitable title, and the vendor holds the legal title to the property in trust."). **As to Maryland:** *See Motels of Md., Inc. v. Baltimore Cnty.*, 244 Md. 306, 223 A.2d 609 (1966) ("Equity treats a contract of sale of real estate as transferring an equitable estate or interest to the purchaser, leaving the vendor the holder of the bare legal title"); *Brewer v. Herbert*, 30 Md. 301, 305 (1869) ("The signing of the contract in equity vested the whole equitable estate in the vendee, and upon his payment of the purchase money entitled him to the legal estate. . . . [F]rom the time the owner of an estate enters into a binding agreement for its sale, he holds the same in trust for the purchaser[.]"). **As to Pennsylvania:** *See Petition of Governor Mifflin Joint Sch. Auth. for Appointment of Viewers to Assess Damages Resulting from Its Condemnation of Certain Lands of W. Marshall Hughes & Son, Inc., Situate in Borough of Shillington, Berks Cnty. (State Rep. Title: Synes Appeal)*, 401 Pa. 387, 391, 164 A.2d 221, 223 (1960) ("After a contract for the sale of real estate is duly executed, the purchaser is the equitable owner thereof, entitled to all advantages that may thereafter arise, and responsible for all loss that may befall it."); *Binswanger of Pennsylvania, Inc. v. TSG Real Est. LLC*, No. 2372 EDA 2015, 2015 WL 13780406, at *5 (Pa. Com. Pl. Sept. 1, 2015), *aff'd sub nom. Binswanger of PA v. TSG Real Est. LLC*, 181 A.3d 1268 (Pa. Super. Ct. 2017) ("The longstanding precedent in this Commonwealth provides that from the moment an agreement of sale for real estate is executed and delivered, it vests in the purchaser equitable title to the real estate."); *Byrne v. Kanig*, 231 Pa. Super. 531, 332 A.2d 472 (1974); *Morgan v. Scott*, 26 Pa. 51, 53 (1856); *Morgan v. Scott*, 26 Pa. 51, 53 (1856). **As to Oregon:** *In re Vermillion,* 176 B.R. 563 (Bankr. D. Oregon) (When a vendor sells Oregon real estate under a land sale contract she retains legal title until the contract is paid. She then must execute a deed to the vendee.).

incurred once settlement agreement was signed by corporate officer), *cert. denied*, 552 U.S. 1188, 128 S.Ct. 1326 (2008). Here, the obligation to make the transfers became legally binding in 1998 when Debtor signed the ICAs. Those obligations are now beyond the reach of 11 U.S.C. § 548, which only permits transfers or obligations to be avoided if they took place within two years of the Petition Date. Without avoiding the ICAs themselves, the obligation to transfer the Properties created thereunder is similarly unavoidable, no matter when the fulfillment of that obligation occurred prior to the Petition Date. The Complaint does not and cannot seek to set those obligations aside.

26. Similarly, in Count II of the Complaint, Debtor seeks to avoid subordination agreements executed between the Lender Defendants and the ICA Defendants alleging that those agreements –

> … functionally eviscerated the Debtor's valuable Rights of Redemption, as well as any ability to refinance such debt or otherwise effectuate a sale. Essentially, the Subordination Agreements were a forced place alienation of property that would prevent the issuance of title insurance and therefore transfer of the Property.

Complaint, at ¶ 151.

27. However, Debtor's Complaint ignores that the Michigan Appellate Court has expressly rejected this very argument and has previously found and ruled that that Debtor sold its "rights of redemption" upon execution of the ICAs in favor of the ICA Defendants in 1998. In rejecting Debtor's argument on this issue, the Court reasoned --

> … the trial court held that the IC Agreement—in particular, Section 4(a)—was enforceable and did not impermissibly clog plaintiffs' equity of redemption. The court noted that the prohibition against clogging the equitable right of redemption has only been applied in the context of a mortgagor/mortgagee relationship and the IC Agreement at issue here was not between plaintiff (mortgagor) and the lender (mortgagee). And, moreover, the court noted, a party may sell its equity right of redemption through a contract that is separate and distinct from the mortgage agreement and the IC Agreement was such an agreement, and it was entered into in good faith and for

> consideration. Accordingly, the trial court dismissed Count I of the RA2 Troy plaintiff's complaint seeking declaratory relief.
>
> ….
>
> But even if they were related business entities, as the Oakland Circuit trial court noted, a "mortgagor may [ ] sell and convey its equity of redemption to the mortgagee in a contract that is separate and distinct from the mortgage agreement and entered into in good faith for good consideration." *Oakland Hills Dev Corp v Lueders Drainage Dist*, 212 Mich App 284, 295; 537 NW2d 258 (1995). As the Calhoun Circuit trial court noted, plaintiffs were sophisticated business entities which certified and warranted that they entered into the IC Agreements after seeking the advice of legal counsel. It is a well-established principle of "contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written ...." *Burkhardt v Bailey*, 260 Mich App 636, 657; 680 NW2d 453 (2004) (quotation marks and citation omitted). Likewise, our Supreme Court has stated that "competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts." *Terrien v Zwit*, 467 Mich 56, 71; 648 NW2d 602 (2002) (quotation marks and citation omitted). Clearly, if plaintiffs were adverse to the terms required by the lender and insurer, plaintiffs could have sought financing for their commercial real estate purchases elsewhere. Accordingly, for the reasons articulated by the Oakland Circuit and Calhoun Circuit trial courts, defendants' motions for summary disposition of plaintiffs' claims in this regard were properly granted.

*See RA2 Troy, L.L.C. v. FI 135 Troy, LLC,* 2023 WL 4044493, at pp. 4-7, (Mich. Ct. App. June 15, 2023).[10] It follows, then, that having transferred its redemption rights to the Properties to the ICA Defendants in 1998 pursuant to the ICAs, no conceivable transfer of those same rights could later be made *involuntarily* in agreements to which the Debtor is not a party. Those agreements

[10] **As to Maryland**: *Simard v. White*, 383 Md. 257 n. 12, 859 A.2d 168 n. 12 (2004) (The right to redeem, even in a mortgage context, can be itself divested by a valid mortgage foreclosure sale, or by a waiver made subsequent to, and outside the mortgage instrument itself.). **As to Pennsylvania**: There apparently is no right of redemption in mortgage foreclosure matters, only for tax or municipal claim matters. See 53 P.S. § 7293. **As to Oregon**: *Swenson v. Mills*, 198 Or. App. 236, 241, 108 P.3d 77, 80 (2005) (A debtor's equitable right of redemption can be conveyed by deed, which conveys whatever title or interest, legal or equitable, the grantor may have in the described property on the date of the deed.)

simply had no impact on the Debtor's equity of redemption. Accordingly, Count II of the Complaint fails to state a claim under 11 U.S.C. § 548(a)(1)(B).[11]

*The Rest of the Claims Asserted Should be Abated or Dismissed for "Shotgun" Pleading*

28. Counts IV through XV assert objections to the proofs of claim filed by the ICA Defendants and the Lender Defendants. Complaint, pp. 28 – 43. Each claim objection adopts all but two paragraphs of the Complaint from inception through Count III (*i.e.* paragraphs 1 – 131 and 134-166). Count XVI seeks to equitably subordinate those claims, in the alternative, pursuant to 11 U.S.C. § 510(c) and similarly adopts the entirety of the Complaint up to County I (i.e. paragraphs 1 – 131). *Id.* at 43-45. The manner in which these claims are pled presents a challenge in discerning those allegations of fact relevant to the relief requested in each count and should be dismissed as a "shot-gun" pleading based upon the authorities cited below.

29. But on a more practical basis, the Court should consider staying or abating the consideration of claims objections and subordination of claims pending a determination of Counts I through III of the Complaint. Litigating these counts, in the absence of money in this estate to pay claims, will waste judicial resources, and is detrimental to both the estate and the ICA Defendants and the Lender Defendants. The Debtor's bankruptcy plan [Main Case ECF No. 59] makes clear, the sole means of recovery in this case is dependent upon the Debtor prevailing on the claims asserted by it in Counts I through III of the Complaint. Moreover, the disposition of those counts of the Complaint will provide further clarity to the ICA Defendants and the Lender Defendants as to how to amend their claims, if necessary, in response to the Court's rulings.

30. In the event the Court determines to address the merits of these counts now, then, as referenced above, each of these counts should be dismissed as being pled in shotgun fashion.

[11] For sake of completeness, Count III is a recovery count under 11 U.S.C. § 550. Count III is dependent upon the success of Counts I and II. Accordingly, if the Court dismisses Counts I and II, Count III must also be dismissed.

31. Specifically, rather than pleading the allegations necessary to satisfy the required elements of each request for relief, Debtor merely "throws the kitchen sink" at each claim by incorporating by reference all of the general allegations of the Complaint into each count. Debtor has made no effort to connect the allegations to the specific requests for relief, unnecessarily leaving to the Defendants and the Court to decipher a morass of facts and claims. *See In re Rudnick*, 2021 WL 1347548 at *3 (Bankr. N.D. Fla. 2021); *see also In re Moulton*, 2019 WL 9406132, at *3 (Bankr. N.D. Fla. 2019) ("One type of shotgun pleading occurs where a complaint contains 'several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts ... contain irrelevant factual allegations and legal conclusions.' Complaints that contain shotgun pleading fail 'to give the defendants adequate notice of the claims against them and the ground upon which each claim rests;' and 'waste scarce judicial resources, 'inexorably broaden [ ] the scope of discovery,' 'wreak havoc on appellate court dockets,' and 'undermine [ ] the public's respect for the courts.).

32. For the above reasons, if the Court does not stay or abate Counts IV through XVI of the Complaint pending adjudication of Counts I through III, then it should dismiss those counts for shotgun pleading.

**<u>Conclusion</u>**

33. In a related case, this Court recently observed –

> The Bankruptcy Code does not supplant property law under the laws of a state, citing to *Butner v. US*, 440 US 48 at page 54, a 1979 decision, and *In Re: R&J Pizza Corp.*, cited at 2014 Westlaw 12973408 at page 2, a decision of the Bankruptcy Court in the Eastern District of New York, October 14, 2014, in which the court stated: 'The provisions of the Bankruptcy Code that govern," quote, 'property of the estate,'" close quote,' are borrowing statutes. That is the Bankruptcy Code does not create any property rights, rather it protects legal or equitable interests already in existence.'

*See RA 2 Boise Fairview, LLC, et al., v. Michael Katz, et al.*, 23-1078-MAM, ECF No. 26, at p. 41, lines 6-16.

34. Yet, supplanting settled property rights under applicable state law is precisely what the Debtor seeks to achieve through the filing of the underlying bankruptcy case and this adversary proceeding. Namely, setting aside for its own benefit the property rights previously transferred to the ICA Defendants and Lender Defendants pursuant to valid, binding, and enforceable agreements entered in 1998. To permit this matter to proceed would be a perverse use of the Bankruptcy Code and the power of this Court.

35. Additionally, to the extent that the Court does not determine that dismissal of the Complaint, the Court should abstain from this case under the *Younger* abstention doctrine. The *Younger* abstention doctrine prevents a federal court from considering a claim that is pending in a state court proceeding when: "(1) the federal proceeding would interfere with ongoing state judicial proceedings; (2) the state proceedings implicate important state interests; and (3) the plaintiffs have an adequate remedy available." *Shepherd v. U.S. Bank, N.A.*, 839 F. App'x 304, 306 (11th Cir. 2020). As mentioned above, the Debtor's rights to the Properties are being litigated in several state court actions. Determination of property rights are important state interests and there is a presumption that the state courts provide an adequate remedy at law. *Id.*

36. Thus, to the extent that the Debtor has assertions to rights in the Properties, the proper fora to make such decisions are the various state courts where litigation is already pending, rather than commencing a new proceeding in a federal court that would interfere with the determination of the various state courts. *See Johnson v. Miami-Dade Cnty. Sheriff*, No. 22-cv-23467, 2022 WL 14813741, at *3 (S.D. Fla. Oct. 26, 2022) (dismissing a complaint for lack of subject matter jurisdiction and under the *Younger* abstention doctrine and noting that by filing the complaint in federal court, the plaintiff "seeks to prevent the state court foreclosure post-judgment proceedings from occurring" and that the requested relief would directly interfere with the state court proceedings); *Deme v. Prokhorov*, No. 20-62582, 2021 WL 4973044, at *1 (S.D. Fla. Sept. 20, 2021) (denying a request for injunctive relief and to quiet title because it "would unduly

interfere with the ongoing state foreclosure proceedings in numerous ways and would effectively nullify the state trial court foreclosure judgment).

**WHEREFORE**, for all of the foregoing reasons, the Complaint should be dismissed, with prejudice, and the Court should order such further relief as justified by the circumstances.

Dated: January 19, 2024

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Ste. 2200
Miami, FL 33130
Telephone: (305) 789-3598

By: */s/ Drew M. Dillworth*
Drew M. Dillworth
Florida Bar No. 167835
ddillworth@stearnsweaver.com
Jenea Reed, Esq.
Florida Bar No. 84599
jreed@stearnsweaver.com

-and-

BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By: */s/ Paul Steven Singerman*
Paul Steven Singerman
Florida Bar No. 378860
singerman@bergersingerman.com
Ilyse M. Homer
Florida Bar No. 826316
ihomer@bergersingerman.com

*Counsel for the Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served electronically through the Court's CM/ECF system upon counsel to the Plaintiff/Debtor registered to receive electronic notice in this case.

*/s/ Drew M. Dillworth*
Drew M. Dillworth